CATHERINE HAYS GRIFFITH

*vs.*

HARRY M. BENZINGER ET AL., EXECUTORS.

*Wills—Undue Influence—Evidence—Gift to Testator's Mis-
tress—Source of Testator's Property—Declarations of
Intention—Discretion of Trial Court—New
Trial—Stare Decisis—Record on
Appeal.*

On appeal by caveatrix, exceptions relating to the issue of
testamentary capacity, on which the verdict was in her favor,
are not before the appellate court for review, regardless of
whether the trial court granted a new trial as to such issue.

p. 578

Undue influence is that degree of importunity which deprives
testator of his free agency, which is such as he is too weak to
resist, and renders the instrument not his free and uncon-
strained act. p. 585

While the existence of undue influence or fraud is incon-
sistent with a lack of testamentary capacity on testator's part,
since the assertion that a will was procured by such influence
assumes that testator had sufficient mental capacity to make a
will, yet on an issue as to undue influence and fraud, testator's
mental and physical condition are relevant and material, as
bearing on the question of what resistance he was able to oppose
to the alleged influence, coercion or fraud. p. 587

While the existence of illicit relations between a testator and
a beneficiary under his will is not in itself and by itself suffi-
cient to support an inference that the will was the result of
fraud or undue influence, yet it is sufficient to throw suspicion
upon the will and to intensify the care and diligence with
which courts should examine the facts relating to its execution
under such circumstances, and it may give to such facts a sig-
nificance which they might not otherwise have. pp. 588, 589

Evidence that the will was made by one whose body had
been so racked and enfeebled by disease that he was unable to

care for himself, and whose mind and will had become so weakened that he was unable to resist any influence exerted on him, less than three weeks before his death, in favor of a woman who had lived with him for years as his mistress, and who completely dominated and controlled him, that it was made in response to her demand that it be made, and gave her his whole estate, valued at more than $200,000, though he had previously made her many valuable gifts, and that he failed to mention therein his first cousin, his nearest relative, though he had always been on friendly terms with the latter, and had expressed an intention of providing for her in his will, *held* to justify the inference that the will was procured by undue influence. p. 590

On an issue as to undue influence in the procurement of a will, a question asked of a relative of testator, whether she knew "by family history" what estate testator received from his mother, was properly excluded, since family history could not well be accepted as the best evidence of the extent and value of an estate. p. 591

On an issue as to undue influence, evidence was admissible to show that the larger portion of testator's estate came to him from his mother and aunt, this reflecting upon his business character and ability, and also upon the influences affecting him in disposing of his property. p. 592

On an issue as to undue influence, evidence that testator had stated that it was immaterial that the caveatrix, his cousin, received nothing under the will of their aunt, since his mother had told him to leave all that he received from her to the caveatrix, and that he intended to do so, was admissible as reflecting upon his mental condition at the time of making the statement. pp. 593, 594

Declarations of a testator, whose will is attacked as procured by undue influence, indicating an intention to make a disposition of his property different from that made in the will, are relevant as reflecting on his mental condition at the time he made such statements, if not too remote in point of time.

pp. 593-595

Code, art. 35,, sec. 3, prohibiting testimony by a party to a suit by or against an executor or other representative of a de-

cedent, as to a transaction with or statement by the decedent, does not apply to the parties to a caveat to a will.    pp. 595, 596

The grant or refusal of a new trial is within the discretion of the trial court, and is not the subject of appeal.    p. 597

The doctrine of *stare decisis* is not to be contravened on the theory that, under the peculiar exigencies of the case, principles of abstract justice call for disregard of a rule established by former decisions of the court.    p. 597

That the record on appeal is unnecessarily large, and in violation of the rules of the Court of Appeals, as including much matter irrelevant to the questions presented by the appeal, cannot be considered by the court, in the absence of any specific or definite statement of what part or proportion of the record is extraneous or irrelevant.    p. 598

A prayer which challenges the legal sufficiency of the evidence to justify the hypothesis that certain controverted facts exist, must concede the truth of all the evidence which tends to establish such facts, together with any inference which may be legitimately and naturally drawn therefrom, regardless of whether such evidence is contradicted.    p. 599

*Decided January 18th, 1924.*

Appeals from the Baltimore City Court (CARROLL T. BOND, J.).

Caveat proceeding by Catherine Hays Griffith, in reference to the alleged will of Edward M. Wise, deceased, by which Harry M. Benzinger and James S. Calwell were named as executors. From rulings on issues transmitted from the orphans' court, and from an order granting a new trial as to one of the issues, said caveatrix appeals. Rulings reversed. Appeal from grant of new trial dismissed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Isaac Lobe Straus,* with whom was *J. Paul Schmidt* on the brief, for the appellant.

*Henry H. Dinneen* and *Eugene Frederick,* with whom was *E. Walter Robinson* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

The record in this case contains two appeals. The first was from rulings of the Baltimore City Court made in the trial of issues involving the validity of a certain paper writing proposed as the will of Dr. Edward M. Wise, who was at the time of his death a resident of Baltimore City. The second is from an order of that court setting aside the verdict of the jury trying the issues in favor of the plaintiff, on an issue involving the testamentary capacity of the decedent, and awarding a new trial as to that issue.

There are one hundred and five exceptions involved in the first appeal, one hundred and four of which have to do with the rulings of the trial court upon matters of evidence, and the other of which relates to its action on the prayers, but the exceptions which we are called upon to consider are not nearly so numerous. The greater part of the exceptions relate to the third issue submitted to the jury—the issue involving testamentary capacity—upon which the jury found their verdict for the plaintiff and against the defendants, the caveatees. Since the court set aside that verdict and directed a new trial of the issue, those exceptions have become wholly immaterial and irrelevant, and are not before us for review. Nor would the case be any different if the trial court had not taken that action, because in that event, the verdict being for her, would have demonstrated that the caveator could not possibly have been injured by the rulings of which she complains.

The outstanding question raised by the first appeal, is whether there is evidence to be found in the record legally sufficient to support the hypothesis that the disputed will was procured by undue influence or fraud, practiced upon the

decedent by Laura Kaiser, sole beneficiary under it. The trial court, at the conclusion of the case for the caveators, directed the jury to find their verdict for the caveatees on the issues involving respectively the execution of the will, knowledge of its contents, undue influence, and fraud. The uncontradicted testimony being that the testator signed the will and that his signature was attested by two witnesses in his presence, and in the presence of each other at his request, the caveatees were clearly entitled to a directed verdict on the issues involving the proper execution of the will by the decedent, and knowledge of its contents by him, and no error can be imputed to the court for its ruling in respect to those issues.

The record in this case contains 936 pages. A comparatively small part of it however relates to the issue of undue influence, and an even smaller part to the issue of fraud, and all the evidence in relation to those issues which is material to the question before us may be briefly stated. Stated narratively it is in substance this:

Edward M. Wise, at the time of his death, was about sixty-seven years old. He was a physician and until a few years before his death had practiced his profession in Baltimore. He appears to have been a cultivated, kindly man, naturally genial and generous and he made some warm friends. About eighteen or twenty years before his death he became afflicted with a very distressing nervous disease referred to in the testimony as chronic progressive chorea, which affected the co-ordination of his muscular system, and which manifested itself in various spasmodic, involuntary muscular contortions, twitchings, and jerks. As the disease progressed and its physical manifestations became more and more noticeable, it became apparent that there was accompanying his physical decline also a perceptible mental deterioration. His habits changed, he became regardless of appearances and conventions, he became slovenly and filthy, he exposed his person in the most public places, without any regard for decency or decorum; he was guilty of grossly

offensive familiarities with women whom he had never known, strangers whom he met casually in public conveyances.

He had no near relatives. His nearest known relative was the appellant in this case, his first cousin, and while he was on friendly terms with her and her daughter, he saw them so infrequently that when they met on the street a few months before his death, notwithstanding his peculiar and distinct appearance, neither of them knew the other certainly or definitely, until their respective identities were made certain through mutual inquiries and greetings.

He left an estate valued at more than $200,000, which, as has already been stated, he attempted to bequeath to Mrs. Laura Kaiser, the only beneficiary under the paper writing in issue here.

When or where or how he first met her does not definitely appear, since she herself did not testify in the case, and no one else seemed to know. Kaiser was her maiden name. She was a divorced woman. She had been married to a Mr. Peck, with whom she had lived for some years in Canada and from whom she was later divorced. While she was living in Canada she received from time to time substantial sums of money from Wise, and when she and her husband separated, Dr. Wise paid the expenses of the proceeding which resulted in a decree divorcing her from her husband, and after she returned to Baltimore he continued his attentions to her. He gave her many costly presents, including furs and jewelry, and a house and lot on West Saratoga Street in Baltimore City, and gave her brother a farm in Anne Arundel County. When she returned to Baltimore he established her in the house on Saratoga Street and for a time visited her there, but finally made his home with her altogether and openly kept her there as his mistress.

That they were not unconscious of the odium which would naturally attach to them because of their conduct, was manifested by various false statements which they gave when

visited by acquaintances not familiar with the circumstances, in explanation of Mrs. Kaiser's presence in Wise's home. He referred to her as "Annie Wise," a cousin, and she explained her apparent affluence by saying that she had received a legacy.

As time went on, the disease from which he suffered grew steadily worse, and the physical symptoms of his mental and bodily decay more conspicuous. As he fell more and more under the influence of the disease from which he suffered, his relations with Mrs. Kaiser became closer and more intimate, until at length, as already stated, he kept her openly in his home as his mistress, and that relation continued until his death.

Towards the end of his life, his condition imposed a very considerable burden upon any one who assumed the duty of giving him such care and attention as he required. That duty Mrs. Kaiser assumed, and she seems to have discharged it conscientiously and well. She appears to have treated Dr. Wise, when he had become almost helpless from the inroads of his disease, with every attention, care and kindness. But whilst she was his mistress, and whilst she acted also as his nurse and his housekeeper, and whilst she treated him kindly and considerately when they were together, her motives nevertheless were mercenary, and she had no real affection for him, at least at that time. She on more than one occasion said that she wished he were dead, and that his condition was more than she could stand, and that she would get all out of him she could while he lived. Not only were the personal relations between Wise and Mrs. Kaiser what we have described, but she also took a part in his business affairs. She kept the keys of his safety deposit boxes, she aided him in buying and selling his property, her brother collected his rents, and she urged him to make a will, and after she had insisted that that be done, she went with him to a lawyer's office, where he made a will in which he gave all of his property to her.

As the end of his life approached, and his bodily infirmities increased, his mind became correspondingly weaker, and he was more easily influenced, until he reached a stage when he could be influenced by anybody, and at that time Mrs. Kaiser exercised a controlling and dominating influence over him, which he was unable to resist, and it was as a result of that influence that he made the will which is in issue in this case, but it does not appear that she suggested or knew what the contents of that will would be, although her anxiety to have it executed indicates that she believed it would be favorable to her. At that time her influence over the decedent was complete; he was constrained to do what she asked him to do, and when she insisted that he make a will, he felt that he must comply. That this is not too strong a statement will appear from these brief extracts from the testimony. Viola Conyer, colored, a servant, in describing the decedent's appearance and behavior said: "I guess often he would worry Mrs. Kaiser's nerves by the way he twitched himself—I don't know how she felt about it; anyway to see a man and take care of him because he is nervous, he would make me nervous to see him that way, and I felt sorry for him myself. I felt sorry for doctor, because he was in such a way; he was no good to himself, he couldn't enjoy things, and Mrs. Kaiser used to tell me doctor used to do everything Mrs. Kaiser said, because Mrs. Kaiser said she could make doctor do anything she wanted him to do. * * * So when they got ready to build a home in Anne Arundel County that old house was moved back and the new house was put forward and so then after we all came back I heard Mrs. Kaiser say to the doctor—the doctor was talking about buying some trees to plant at the Anne Arundel home, he wanted English walnut trees and plum trees—there were two at the Saratoga Street house, I sawed them off, they got in my way, I sawed them down, they got in my way—Mrs. Kaiser said, 'Yes,' and there has to be a will made, and the doctor said, 'All right,' and then they got ready and they went out. I asked

Mrs. Kaiser—it wasn't by business, but I asked Mrs. Kaiser, I said, 'Who is that home going to be,' and she said, 'Mine.' I said, 'That will be fine'; she said, 'No, doctor is going to give that home to John, but that will be fixed, for if I am the longest liver it comes back because John is grafting, Mabel is not John's daughter, that is only his stepdaughter.'" Laura Stockton, another witness, who appears to have been on confidential terms with Mrs. Kaiser, speaking of an occasion in November preceding Dr. Wise's death, said: "A. I saw her and I saw Dr. Wise. He came down and he was ready to go out. That was the last time I saw him alive and he said to me—she told me to go and shake hands with him, and she went in the kitchen and kissed him goodbye; she told him to be careful, she was very solicitous about him. She said, 'I don't know how much longer I can stand this, it is near setting me crazy, his actions.' She said, 'He promised to bring the will home today, I want to see the will, I don't believe no man, and he also promised to make the house over to me today. Q. What was it she said with reference to the will? A. She said he promised to bring the will home that night; she wanted to see what was in the will, she didn't trust no man. Q. Mrs. Stockton, have you stated that exactly as Mrs. Kaiser said it to you, she didn't trust no man? Did she put in any word? A. Yes, sir, she made it a little plainer. Q. Tell the jury how she said that? A. She said she didn't trust no damn man." She also said: "A. She (Mrs. Kaiser) said she believed the doctor was losing his mind, he was nearly setting her crazy and she said that she was going to get all she could before he died. * * * She told me the doctor's mind was getting so bad he could be influenced by anyone and she kept him in the house after that pretty much, she didn't let him go out. * * * She said that she was praying every night that the doctor would die and after he died she was going to have one wonderful time."

Catherine Frazier, colored, gave this testimony: "Did you ever hear Mrs. Kaiser say anything with reference to

Dr. Wise? A. I never heard her say anything with reference to Dr. Wise, just only when he was laying a corpse, that is all I know when she used to come out to the house and go on the poor excursion, he 'dasn't' leave the house until she came. Q. (The Court): What do you mean? A. She didn't allow him to leave until she came and got him. Q. What do you mean? A. He was a member of the poor excursion and she told him not to leave, and he didn't leave because she had the influence over him. Q. She asked him out? A. Yes, sir. Q. He wouldn't leave until she told him? A. No."

Maria Brown, colored, testified: "Did you hear Mrs. Kaiser say anything at the house at that time whilst she was engaged in removing Dr. Wise's furniture and effects from the house? A. Well, the Misses Key was speaking of how the doctor would throw himself and break up things. Q. Miss Key was speaking of what? A. Of how the doctor would throw himself and break up chairs, would throw himself on a chair and break it; Mrs. Kaiser said, 'When he breaks my things I make him get more.' I said, 'Mrs. Kaiser, can you make him do anything'; she said, 'Yes, I can make him do anything I want.' "

And four or five weeks before his death the following conversation took place between him and Mrs. Kaiser's father: "You were by yourself with him in the house? A. Yes, sir. He told me—he says—he always called me Pop—he said, 'Pop, come here.' I went there and he said, 'Don't you think Laura has enough in $40,000.' Q. Who said that? A. The doctor said that. Q. The doctor? A. Said to me. Q. Said 'Don't you think Laura has enough with $40,000?' A. I said, 'If she hasn't enough with $40,000 and the interest, she ought to hide herself. That is what I told him."

And Mrs. Kaiser accompanied him to the lawyer's office where the will was executed, and remained there in an outer room until he had executed it, and when it was executed it was placed in a safe deposit box to which she held the key.

Whether this statement of the facts relating to the issue of undue influence and fraud is true or false is entirely collateral to any question before us. In making it we have assumed the truth of all evidence tending to support the caveator's theory that the will was produced by fraud and undue exercise, but we have done that only because the defendant's "E" and "D" prayers, which were granted by the court, conceded the truth of that evidence.

The inquiry then is are the facts stated legally sufficient to support the inference that the will was obtained by undue influence or fraud.

The law relating to testamentary disposition induced by undue influence and fraud is too well settled to justify any extended or elaborate exposition, but the difficulty lies in determining whether a given state of facts will support an inference that such a disposition of property in a given case is the result of fraud or undue influence. The general principles controlling such an inquiry are stated in the case of *Grove* v. *Spiker,* 72 Md. 301, where it was said: "Undue influence is that degree of importunity which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act. It is closely allied to actual fraud; and like the latter, when resorted to by an adroit and crafty person, its presence often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, and the more helpless and secluded the victim, the less plainly defined are the badges which usually denote it. Under such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be looked for, the situation of the party taking benefits under the will towards the one who has executed it, and their antecedent relations to each other, together with all the surrounding circumstances, and the inferences legitimately deducible from them, furnish, in the absence of direct evidence, and often in the teeth of positive testimony to the contrary, ample

ground for concluding that fraud or undue influence has been resorted to and successfully employed." And what was said in that case was complemented in *Frush* v. *Green*, 86 Md. 501, in which it was said: "Undue influence is not, of course, every mere entreaty or pressing solicitation that may be invoked to sway the conduct or to persuade the judgment of another; but it is that degree of importunity which deprives one of his free agency—such as he is too weak or too feeble to resist, and such as will render the instrument executed under its supremacy not his free and unconstrained act. It often closely resembles and is near akin to actual fraud, and like the latter when most cunningly employed is exceedingly difficult to expose. From the very nature of the wrong itself, it is rare that direct evidence can be procured to unmask it, and hence the results accomplished in a given case, the divergence of those results from the course which would ordinarily and naturally be looked for, the situation of the parties taking benefits under an instrument, alleged to be the product of its dominion towards the person who has executed that instrument, their antecedent relations to and intercourse with each other; the legitimate, but unrecognized claims of others upon the bounty of the one who has discarded them; their dependence upon him; his prior declaration; the instincts of justice and the promptings of gratitude of which every unbiased mind is sensible; the natural ties of affection, together with all the circumstances surrounding the entire transaction under investigation, and the inference legitimately deducible from them, often furnish, even in the teeth of directly contradictory testimony, ample ground for the conclusion that undue influence has been successfully resorted to, to accomplish an end which is grossly unjust and whose very existence cannot be satisfactorily accounted for or explained except upon the theory that undue influence has produced it." The principles announced in these two cases have been repeatedly approved by this Court and must be regarded as the settled law of this

State. *Watson* v. *Y. W. C. A.*, 137 Md. 360. And the statement of the law in those cases comprehends all the legal principles applicable to the facts before us.

While the existence of undue influence or fraud in a given case is inconsistent with a lack of testamentary capacity in the person whose act they are said to have affected, since the assertion that a will was procured by undue influence must assume that a will which but for such influence or fraud is valid exists, and necessarily concedes that such a person was at the time possessed of sufficient mental capacity to make a valid will (*Stirling* v. *Stirling*, 64 Md. 138), yet in all cases where they are in issue, the mental and physical condition of the person whose act is under consideration are relevant and material, since they bear directly upon the question of what resistance such person was able to oppose to the alleged influence, coercion, or fraud which is said to have been exercised upon him, although, as we have said, in dealing with issues involving the existence of undue influence or fraud in relation to the execution of a will, it is assumed that the testator was possessed of sufficient testamentary capacity to make a valid testament. *Stirling* v. *Stirling, supra.*

The mere fact that a person maintained illicit relations with another in whose favor a testamentary disposition was made by such person does not in itself raise a presumption of law or of fact that such disposition was obtained by fraud or undue influence, and the general rule embodying that principle is set out in the following language in *Alexander on Wills,* par. 590: "The mere fact that illicit relations exist between a man and a woman raises no presumption of undue influence because of a testamentary disposition by one in favor of the other. It is not essential to a will or a deed that the motives which led to the act should be virtuous or that the object of the donor's bounty should be meritorious. To the argument that the influence of a mistress is illegal because it sprang from an unlawful relationship, it has been said that 'however reprehensible such influences may be, if a testator

voluntarily chooses to be actuated by them, it is a privilege
he may enjoy under the law that secures to every one alike
the right to dispose of his property without restraint upon
his own judgment and conscience.' "   But the fact that such
relations existed between the decedent and the sole bene-
ficiary under the proposed will is a fact to be considered in
connection with other facts bearing upon the question, in
determining the weight and sufficiency of evidence adduced
to show that a will was made as a result of undue influence or
fraud.

The weight to be given such a fact must depend largely
on the other facts which accompany it, and the circumstances
of each particular case, and no more specific or definite rule
than this can be formulated, that is, that while the existence
of such relations between a testator and a beneficiary under
his will is not in itself and by itself sufficient to support an
inference that the will was the result of fraud or undue
influence, yet it is sufficient to throw suspicion upon the
will and to intensify the care and diligence with which courts
should examine the facts relating to the execution of it under
such circumstances, and it may give to such facts a signifi-
cance which they might not otherwise have.

In *Saxton* v. *Krumm,* 107 Md. 401, in dealing with that
question it was said:

"The position of the appellant is that it was competent for
the jury, as matter of law, to infer the will was procured by
undue influence from the testator's illicit relation with the
legatee, and from the unnatural disposition of the property,
which disposition is contrary to his previously expressed
purpose.   To this proposition, which was earnestly pressed
upon us by the very able arguments of the appellant's coun-
sel, we cannot assent.   There appears to be a general concur-
rence in the authorities that neither an illicit relation, nor an
unjust and unnatural disposition of the property is sufficient
*per se* to warrant a conclusion of undue influence.   They
are circumstances properly to be considered by the jury in
connection with evidence of undue influence, but they are not

in themselves evidence either of fraud, or undue influence. Where there is evidence of external acts of fraud, or undue influence, and especially where there is evidence that the capacity of the testator was impaired, the circumstances here relied on would be of great weight, as is evidenced from the cases of *Grove* v. *Spiker,* 77 Md. 300, and *Hiss* v. *Weik,* 78 Md. 439. In *Layman* v. *Conrey,* 60 Md. 286, and in *Dalrymple* v. *Gamble et al.,* 68 Md. 523, the principle here stated is fully recognized and applied. In the latter case the Court said: 'A good deal was said in argument as to the relations which existed between the testator and this legatee, but assuming them to be as reprehensible and as immoral as they have been pictured, still such immoral conduct, of which they were both equally guilty, did not deprive him of the power of making a will in her favor, nor her of the right to receive whatever property that will gave her.'

"It would be a great inconsistency and absurdity to accord to a testator the power to dispose of his estate in any way he may think proper, consistent with the settled principles of the law, and at the same time say that this will may be annulled, if it appears that its disposition is unjust, inequitable, or unaccountable. The effect of such a principle would be the practical denial of the free right of testamentary power in a very large class of cases."

And whatever may be the law elsewhere it is undoubtedly true that in this State the rule is as stated in that case. There are decisions to the contrary, such as in the case of *Platt* v. *Elias,* 186 N. Y. 371, 11 L. R. A. N. S. 554, and *Snyder* v. *Erwin,* 229 Pa. St. 644, in which the existence of such relations were held sufficient to raise a presumption of fact sufficient to warrant an inference that a testamentary disposition by one party to such a relation in favor of the other is the result of undue influence, but in the case referred to this Court has expressly declined to go so far.

Applying these principles to the facts stated by us, we are unable to agree with the conclusion of the trial court that there was in the case no evidence legally sufficient to justify

an inference that the will was procured by undue influence. It was made, if we assume the truth of all the evidence supporting the caveators, by a man whose body had been so racked and enfeebled by the ravages of a distressing and exhausting disease that he was unable to care for himself, whose mind and will had become so weakened that he was unable to resist any influence exerted upon him, less than three weeks before his death, in favor of a woman with whom he had lived for years as his kept mistress and who completely dominated and controlled him. It was made in response to her demand that it must be made, and in it he devised and bequeathed her his whole estate, valued at more than $200,-000, notwithstanding the fact that in his life time he had lavished upon her many valuable gifts, and notwithstanding the fact that only a short time before the decedent had asked Mrs. Kaiser's father if $40,000 was not enough for her. He had, it is true, no relatives nearer than his first cousin, Mrs. Griffith, but his relations with her and with her daughter appear to have always been friendly and affectionate, and while it cannot be said that they had any claims upon his bounty, or that he was in any way obliged to consider them in the disposition of his estate, nevertheless they were his nearest blood relation and he had, if we assume the truth of certain excluded testimony which should have been admitted, expressed an intention of providing for them in his will, and the fact they were not even referred to in his will, in connection with the other facts to which we have referred, is not without significance. While we do not mean to say that those facts or any of them exist, we do say that, if they exist, they are sufficient to justify an inference that the will was procured through undue influence exercised upon the decedent by Mrs. Kaiser, because it may well be inferred from them that but for such influence it would not have been executed at all.

In regard to the issue involving fraud, it is sufficient to say that the record contains no evidence legally sufficient

to have warranted its submission to a jury, and we find no error in the ruling on the prayer relating to it.

Coming next to those exceptions involving the rulings of the trial court on matters of evidence, we will only consider those which relate to the issue of undue influence, since for reasons already stated the exceptions relating to the other issues are immaterial.

In the examination of Miss Alice Griffith, she was asked this question: "Do you know * * * as a matter of fact by family history, what estate Dr. Wise received from his mother?" An objection to that question was sustained and that ruling, which is the subject of the first exception, is obviously correct, since "family history" could not well be accepted as the best evidence of the extent and value of an estate. But the caveator then made this offer: "We offer to prove by this witness, Miss Griffith, that Dr. Wise received from his mother an estate of approximately $60,000 and also, through his mother, from his aunt, Margaret Hays, his mother's sister, an estate of approximately $80,000, and that this constituted the substantial bulk and corpus of the estate which he left at the time of his death," and upon the defendants' objection the court overruled that offer, and that ruling is the subject of the second exception. By overruling that offer, the court in effect conceded that the witness if permitted could prove the facts embodied in it, and the only question open is whether such facts are relevant and material to the issue which the jury had been sworn to try. In *Underhill on Wills,* page 188, it is said: "In all cases where the procurement of a will by undue influence or fraud is alleged, the evidence, whether direct or circumstantial, should be permitted to take a very wide range. The nature of the relations and dealings between the testator and the beneficiaries, the extent of the property of the tstator, his social and commercial standing, his family connections, the claims of particular persons upon his bounty, the situation of the beneficiaries, social and pecuniary, the situation and the mental condition of the testator, the nature and the contents of the

will itself, and all the circumstances under which it was
executed, may be considered as facts from which fraud and
undue influence may be inferred, or by which they may be
disproved," and in *Alexander on Wills,* page 910, the rule is
stated in this language:    "To ascertain when coercion and
consequent subversion of intention exist requires a very ex-
tended and refined inquiry in a probate case, and for this
reason the courts allow great latitude on an issue of undue
influence.    The financial worth of a contestant is admissible
to show why he did not receive a larger share.    It has been
said that when the issues before the jury are fraud and undue
influence, any evidence, however slight, tending to prove the
issues, is admissible."    The facts embodied in the offer were
material both as reflecting upon the business character and
ability of the decedent, as well as upon the influences which
affected him in disposing of his property.    It required less
acumen and business ability to hold property acquired
through the bounty of others than to accumulate it through
his own efforts, just as it would have been natural in dis-
posing of such property to at least consider in connection
with the other circumstances affecting him the source from
which the property came.    Such facts had not, it is true,
any conclusive force, but they did have some weight, and the
caveators were entitled to have them considered by the jury
together with all the other facts in the case.    What has been
said in reference to this exception also applies to the eighty-
eighth, eighty-ninth, and ninetieth exceptions which were
taken to the action of the trial court in excluding evidence
tending to show the source from which the property possessed
by Dr. Wise at the time of his death came, and that evidence
also should have been admitted.

In the course of the examination of Miss Alice Griffith,
she was asked this question:    "Now, then, tell the facts of
the relationship of your Aunt Ellen to your mother and your-
self during her lifetime, and the disposition of her property,
and then what did Dr. Wise state, if anything, about it?"
The court sustained an exception to that question and the

caveator then made this offer: "We offer to prove by this witness, Miss Griffith, that after the death of her mother's aunt, Ellen Matthews, in 1907, Dr. Wise frequently remarked upon the failure of Aunt Ellen Matthews to leave all her estate to Mrs. Griffith, as she during her lifetime, and as Dr. Wise knew and remarked, she had repeatedly declared she intended to; that on one occasion, when that matter was again the subject of discussion, in the year 1908, Dr. Wise stated that the fact that Mrs. Ellen Matthews had not left her estate to Mrs. Griffith would really make no great differ-. ence to Mrs. Griffith, because his own mother before her death had requested him to leave the estate, which he might receive from her, to Mrs. Griffith and her daughters, and that he, Dr. Wise, intended to leave to them, Mrs. Griffith and her daughters, substantially his whole estate." The court overruled that offer, and those rulings are the subject of the fourth and fifth exceptions. During the re-direct examination of this witness, she was asked this question: "Now, Miss Alice, with reference to that, Mr. Dinneen asked you whether he had said anything of that sort to you before, and in answer to that you replied he had given you a very definite promise before. Tell the jury what that promise was?" An objection to that question was sustained, and that ruling is the subject of the ninth exception.

The general rule is that declarations of a testator, whose will is attacked on the ground that it was procured by undue influence, indicating an intention to make a disposition of his property different from that made in the will, are always relevant, as reflecting upon his mental condition at the time he made such statements, when they are not too remote in point of time. The general principle controlling the admissibility of such evidence is stated in *Alexander on Wills,* pp. 920 to 923, as follows: "Declarations of a testator, not part of the *res gestae,* are not admissible either to prove or disprove any statement of fact contained in them, nor for the purpose of showing the exercise of undue influence. But undue influence is associated with testamentary capacity, a

strong and vigorous mind being better able and more likely
to resist any influence than one which is weak and vacillating.
For such reasons declarations of a testator, either before or
after the execution of the will, are admissible because from
a fair inference from all the circumstances such declarations
show the party's mind at the time the will was executed, his
susceptibility to the influence, and his relations with those
around him and the persons who are the beneficiaries of his
bounty.     Where mental capacity is involved, as upon the
issue of undue influence, it is only necessary that the declara-
tions testified to should be sufficiently near in point of time
so as to be of value in determining the matter in issue.     The
question of remoteness is one for the court to determine
according to all the circumstances of the case, and the weight
of the testimony is to be governed according to the facts. * * *
On the issue of undue influence two elements are involved:
(1) The conduct of the party charged with exercising the
influence, and (2) the mental state of the testator as affected
by such influence which may require a disclosure of his
strength of mind and of his purpose as to the disposition
of his property. * * * While declarations of a testator are
not sufficient to establish the fact of undue influence, they
are admissible to show its extent and effect." And in 28
*R. C. L.* page 107, where it is said: "On the issue of undue
influence declarations of a testator are admissible in evidence
when they are part of the *res gestae,* but it is not essential
that statements made by him should be of the *res gestae* to
render them admissible, though their value as evidence di-
minishes in proportion as they are remote from the date of
the will.     It is a generally recognized rule that they may
be introduced in evidence to show the state of the testator's
mind, as, for example, to show that he felt that he was obliged
to make the will in question to keep peace in the family."
And the principles thus stated have been frequently applied
by this Court.     *Grill* v. *O'Dell,* 113 Md. 634; *Moore* v.
*McDonald,* 68 Md. 338, and cases there cited.

Applying these principles to the facts involved in these exceptions, there was error in overruling the caveator's offer, which is the subject of the fifth exception. The questions which are the subject of the fourth and ninth exceptions are not in proper form, and the objections to them were properly sustained.

The ninety-second, ninety-third, ninety-fourth, ninety-seventh, ninety-eighth, ninety-ninth, and one hundred and first exceptions refer to the testimony of Mrs. Catherine Hays Griffith. Through the questions involved in those exceptions the caveator sought to prove, (1) the relations between her and her daughter and Dr. Wise, and (2) the fact that he had some twelve or fourteen years before told her of his intention in respect to disposing of his property. This testimony was relevant and should have been admitted, unless the witness was disqualified under the terms of article 35, section 3, C. P. G. L. Md. But it was held in *Hamilton* v. *Hamilton*, 131 Md. 508, 510, that that statute did not apply to parties to a caveat to a will. In that case this Court, speaking through CHIEF JUDGE BOYD, said:

"Thomas Hamilton, one of the caveators, was called by them. He testified without objection to a number of things and was afterwards asked: 'Did you ever hear any conversation between your father and Charlie after Charlie came there in March in regard to the property?' He answered: 'Yes, sir'; and then was asked: 'Just tell the jury about the conversation; where it took place and what was said?' 'Charlie' is the appellant. He is the executor and sole devisee and legatee named in the will, and was, by the order of the orphans' court, made defendant, and the appellees, who were the caveators, were made plaintiffs in the trial of the issues.

"The appellant's objection is based on the contention that Thomas Hamilton was not a competent witness under section 3 of article 35 of the Code. He was undoubtedly competent to testify to what Charlie said, and what his father said to Charlie could not possibly have injured the appellant, as it

did not reflect upon the question of testamentary capacity and
rather tended to show that he was not susceptible to undue
influence. Beyond that no authority has been cited to sustain
the appellant's position—that he was incompetent. The
practice in this State has been to permit the caveators and
caveatees to testify on the trial of issues framed on caveats
to wills. They are not proceedings 'in which judgments or
decree may be rendered for or against them,' as no judgment
is entered in the law court where they are tried. Other
reasons might be given for not applying the statute to the
trials of issues on caveats to wills but as such is the estab-
lished practice, and our reports show that caveators and
caveatees have been without question permitted to testify
since the present statute was passed, we do not deem it
necessary."

In addition to what is said there, it is apparent that the
reason for the statute does not exist in such cases. The
statute was intended to prevent one party to a transaction
from testifying to the acts and declarations of a decedent
whose acts are under consideration in a proceeding to which
the witness is a party, to enforce obligations arising from
such transactions. In our opinion therefore the witness
should have been permitted to answer these questions.

In regard to the remaining exceptions it is sufficient to
say that after examining them carefully, we have discovered
no harmful error in any of the rulings involved in them.

This brings us to the question presented by the second
appeal. In connection with the question presented by that
appeal we have been referred to the entire record in the case,
but after a very careful examination of it, it is not necessary
in our opinion to give any detailed or extended analysis of
its contents. By that appeal we are asked to review the
action of the lower court in granting a new trial as to the
third issue, which involved the testamentary capacity of the
testator at the time he executed the will in question, and the
argument of the appellant amounts to a request that we shall

disregard and overrule the cases decided by this Court in which it has been held that the action of a trial court in granting or refusing a new trial is within the discretion of such court and will not be reviewed on appeal. In *Archer* v. *State,* 45 Md. 460, it was said: "In civil cases no bills of exceptions have been ever allowed on motions for new trials, and the rulings of courts upon such motions are entirely within their discretion, and from them no appeal lies to this Court. *Sauer* v. *Schulenberg,* 33 Md. 289; *Balto. City Pass. R. R. Co.* v. *Sewell,* 35 Md. 249, 250; *Sittig* v. *Birkestack,* 38 Md. 165; *Merrick* v. *B. & O. R. R. Co.,* 33 Md. 481. The bill of exceptions not being properly before this Court, and the ruling of the circuit court upon the motion for a new trial, not being subject to review by this Court, this appeal, so far as that motion is concerned, must be dismissed." And what was said there was affirmed in the later cases of *Miller* v. *State,* 135 Md. 382, and *Myers* v. *State,* 137 Md. 487.

The appeal constitutes an attack on the doctrine of *stare decisis* on the somewhat nebulous ground that principles of abstract justice require that those decisions should be disregarded because of the peculiar exigencies of the case before us. But we are not at liberty to consider any such appeal. The doctrine of *stare decisis* is a part of our judicial system, and it rests upon the principle, that the law by which men are governed should be fixed, definite and known, and that when it is declared by a court of competent jurisdiction authorized to construe it, such declaration, in the absence of palpable mistake or error, is itself evidence of the law until it is changed by competent authority. The rule which we have stated was announced by our predecessors after a full and careful consideration of the principles which it invokes, and has been affirmed again and again, and must be regarded as controlling in this case.

But even if we were at liberty to review the ruling of the court involved in the second appeal and the evidence relating to it, it may be said that, after a very careful examination

of it, we have discovered nothing in it which would warrant us in holding that the conscientious and learned judge who tried this case in the lower court acted arbitrarily or that he abused the discretion vested in him.

From what has been said it follows that the rulings involved in the appeal in No. 77 on the Docket of the October Term, 1923, of this Court will be reversed and the case remanded for a new trial, while the appeal in No. 78 on that Docket will be dismissed with costs to the appellees, the cost of volume 3 of the record in the combined appeals to be taxed as part of the costs in No. 78.

Some point was made by the appellants that the record in these cases is unnecessarily large, and in violation of rules 4, 5 and 6, of this Court, in that it included much matter irrelevant to the questions presented by the appeals, such as colloquies between court and counsel, remarks of counsel, and the like. That objection is undoubtedly well taken, but since, in the absence of any specific or definite statement of what part or proportion of the record is extraneous and irrelevant, it would impose a burden upon this Court which would seriously interfere with its discharge of the imperative duties imposed upon it, if it were to undertake the additional duty of segregating from the records in cases before it such parts of them as were extraneous or irrelevant, and since counsel have not, except in the most general way, indicated those parts of the record which are unnecessary to a consideration of the questions before us, that objection will not be entertained.

> *Rulings in No. 77 on the Docket of the October Term, 1923, reversed and case remanded for a new trial; the appeal in No. 78 on the Docket of the October Term, 1923, dismissed with costs to the appellees, the costs to include the cost of Volume 3 of the record in the combined appeals.*

On motion for modification of opinion.

The motion for a modification of the opinion in this case must be overruled.    The reasons for the motion are not definitely stated but may be inferred from the following statements which it contains:

> (1) "The demurrer prayers in this case conceded that the statements attributed by the caveatrix's witnesses to Mrs. Kaiser and to the testator had been made.    That concession, however, did not go to the extent of admitting as facts the truth of such statements. Necessarily, therefore, any deduction made from the premise that all of the admissions charged by caveatrix's witnesses against Dr. Wise and Mrs. Kaiser were in point of fact true is, in the nature of things, erroneous."

The point of this contention is not altogether clear.    It is an essential rule both of law and of logic that a prayer which challenges the legal sufficiency of the evidence in a given case to justify the hypothesis that certain controverted facts exist, must concede the truth of all the evidence in the case which tends to establish such facts, together with any inference which may be legitimately and naturally drawn therefrom, regardless of whether such evidence is or is not contradicted.    That rule has been so often stated that citation of authority in support of its is scarcely needed, but for illustration, reference may be made to the following cases:

*Jones* v. *Jones,* 45 Md. 144, in which it is held that such a prayer cannot be granted without assuming the truth of all the evidence given by the adverse party, although contradicted by the evidence of the party asking for such instruction.

*Merchants & Miners Transp. Co.* v. *Story,* 50 Md. 4, in which it is decided that to sustain a prayer denying the right of a plaintiff to recover, there must not only be proof to support the hypothesis of the prayer, but the facts stated must constitute a complete bar to the action, notwithstanding the

truth of all the facts in the cause, and all inferences fairly deducible therefrom; and in

*Leopard* v. *Ches. & Ohio Canal,* 1 Gill, 222, which decides that before the court can grant such an instruction it must assume the truth of all the testimony given to the jury tending to sustain his right to recover and all inferences of fact fairly deducible therefrom.

Other cases might be cited but these are sufficient to illustrate what we have said.

(2) The second point is presented in the following statement:

"Under point 2 this Court, in effect, says that the evidence under the undue influence and fraud issues, conceded for demurrer purposes to be true, establishes the fact that Mrs. Kaiser exercised a controlling and dominating influence over him (the testator) which he was unable to resist, and it was as a result of that influence that he made the will * * * in this case.

"* * * In the instant case the statement is made by this Court as a conclusion of fact: (1) that the testator was 'easily influenced'; (2) that Mrs. Kaiser 'exercised a controlling and dominating influence over him,' and (3) that 'as the result of that influence (which would exclude every other factor from consideration) he made the will * * *.

"It is respectfully but earnestly submitted that the language in question should be modified. That request is made, not merely for the purposes of the instant case, but in order that an unfortunate precedent may not be set. The evidence from which the Court drew the stated inference was that of two or more colored women and a white one, who testified as to certain statements which Mrs. Kaiser made."

What has been said in reference to the first point also applies with equal force to this, and it is sufficient to add that when the will involved in this case was attacked on the ground that Mrs. Kaiser procured its execution by undue influence

exercised and practiced upon the testator, it is not apparent why her admissions concerning the nature and extent of her influence over him should not be regarded as evidence of that fact, and it is difficult to see how that principle can be affected by the consideration that the witnesses who gave the evidence as to the statements were "two or more colored women and a white woman."

It seems hardly necessary to add that, in dealing with facts relating to the propositions presented by the prayers challenging the legal sufficiency of the evidence in the case to show undue influence, we did not and could not decide that those facts had actually been established in the case, but we did decide and meant to decide that the existence of such facts could have been inferred from evidence in the case, the truth of which for the purposes, and only for the purposes, of considering those prayers, we assumed as a necessary postulate of the propositions submitted by the prayers, and while to iterate and reiterate principles so obvious seems unnecessary, nevertheless in the opinion it is explicitly stated that the existence *vel non* of the facts referred to was only assumed for the purposes of the opinion.

Our attention has been called to the award of costs in these cases. The allowance in No. 77 was inadvertent and has been corrected, but the allowance in No. 78 will be allowed to stand, since in that case the Court was not dealing with an appeal from the rulings of the lower court made in the trial of issues from the orphans' court, but with the limits of its own jurisdiction. *Kamps* v. *Alexander,* 133 Md. 202.

*Motion for modification of opinion overruled.*

Filed January 31st, 1924.