I stated my views at the conclusion of this case, as follows:
"I think it might be wise for me to state my view of the facts in this case at the present time, even if I find upon completion of said statement that I will not now render my final opinion.
"The complainant and the defendant were co-employes at one of the prominent hotels in Atlantic City, the complainant as manager of the laundry, the defendant as a parlor maid.
"The complainant had a room and lived, or at least had the room for the purpose of occupancy, at the hotel. They were very friendly. I will refer to the extent of that friendliness later.
"From the time of the death of his first wife they apparently became lovers. This extended for some period of time and apparently extended beyond the date of his second marriage, which was April 25th, 1931. It continued for some months after that. During some period of that time, she having heard rumors that he was married, asked him concerning the same, and he, upon a number of times, denied such marriage. Once or twice at least, apparently in a joking way, he admitted it, and then would later deny it. She did not, until some later period, ascertain whether it was true that he was again married or not, but it seemed to make no difference in their relationship. He testified that upon numerous occasions she visited his room, upon some of the occasions bringing with her wine for them to drink. Upon some, perhaps many occasions, they occupied the bed together. He goes to great extent upon that fact. He insists that both before his marriage to his present wife and thereafter they continued this course of conduct, and that he had intercourse with her upon many occasions. In fact, his testimony was such that, if believed to any extent, would cause belief that this was practically a continuous affair; that she would, upon innumerable occasions, come to his room, disrobe, get in bed, and in some instances wait for his coming. It shows, if true, a very scant desire upon the part of either to obey the moral law, and certainly if he is believed at all, it shows *Page 139 
him to be a most licentious character. If his story is true, the fact of his marriage caused no cessation in these relationships. It is difficult to believe. He goes further and says that upon more than one occasion she supplied him with wine and caused him to drink until he was not in full possession of his senses; that upon one occasion he exhibited to her a deed for the property which he and his present wife owned and in which they lived in Margate. That particular deed, of course, was not the deed under which they held as joint tenants, but was the deed by which he obtained title; that she, by subterfuge, obtained that deed and took it to a scrivener in Pleasantville and that later, upon the Saturday in question, when the deed was signed, she again supplied him with liquor, and perhaps with other inducements, and caused him to go with her to the home of this scrivener, where he executed this deed.
"He gives no explanation whatever why he should do such a thing. He says he was drunk and did not know what he was doing. The lapse from the moral code does not impress one with the fineness of his moral character. His testimony is alone on the point as to whether or not he was drunk upon the occasion when he went to Pleasantville where he signed the deed.
"It is true that he has corroborated the fact that he later on that day was intoxicated and showed the evidence of the intoxication. His wife so testifies and I do not have the slightest doubt but that when he arrived home that night he was drunk, if he was not drunk when he signed the deed. I do not know how any man who was accustomed to drinking could avoid being drunk after doing such an infamous act if he was in his own senses; how he could face his wife after having conveyed to one whom he admitted to be a paramour, to one with whom he had been having illicit intercourse continually, all of his interest in their property; how he could face that wife in his proper senses, and if he was not drunk before, it is no surprise that before he reached home he was drunk. *Page 140 
"I cannot avoid believing the witness Garrison and the witness Mrs. Garrison, when they testified that he was not intoxicated and showed no signs of intoxication at the time he signed the deed. I cannot help but believe that Mr. Garrison was telling the truth when he said he informed him of the contents of this paper, when he asked Kramer if he was a widower and Mr. Kramer replied that he was. There was no reason for Garrison to violate his oath and tell something that is not true.
"There are many difficulties in this case. I can hardly believe that any man in his right mind would do the things that this man Kramer has done, and I am not so sure that if these proceedings were brought under some other provisions of the law that my viewpoint might not be considerably different.
"Kramer's manner on the witness-stand was not convincing. He did not impress the court as giving the court the full benefit of the truth of the case. As has been commented upon by counsel, it was necessary for the court to warn the witness of his duties as a witness. Therefore, it seems clear to me that this man, for some unknown reason which does not at present appear, was willing to execute this deed for his interest in this property. It may be, if his story is true, that he thought thereby to prevent her from divulging what had occurred between them. It may be that he did it to prevent the bringing out to his wife's attention the facts which he has since brought out, if they are facts. I say that may be the reason, but how could he believe that the very acts he did would not eventually bring the whole situation to the attention of his wife, that is, inform her of his misconduct.
"On the other hand, my sympathy is not with the defendant in this case. Her manner of giving testimony is very convincing. Her story, to a great extent, rings true, but I am very doubtful of the truth of her assertions made to-day, that her friendship with Kramer had the limitations which she states it had. I cannot help but be suspicious that there were more than friendly relations between these two *Page 141 
parties. I cannot conceive how the thing occurred, without any reasons at all, as it is admitted that Kramer did it, and it may be that he is correct in his explanation of the course of the case, of their relations, or at least of their friendliness.
"According to her story, she has never given to this man anything except the social friendship between them at the hotel, to drink a few bottles of wine together, called upon friends together, had his affection sufficient for him to ask her to marry him, and, according to the testimony of one or the other, replied by saying that it was not necessary to hurry up the marriage. Why should she feel that she is now entitled to receive from this man all the right and title that he has in a property in which he and his present wife are living? I cannot believe that she is honest in feeling that his friendship with her and her friendship with him is sufficient excuse in morals, whether it is or is not in law or equity, for her to retain this property. If his story is true that they were as intimate as he says they were, there may be considerable ground for her feeling that she was entitled to receive all that he could possibly give her for what he has accused her of. She says not. She says that is not true.
"Now, gentlemen, that is a statement of the facts as I find them. Upon having this statement reduced to transcript by the stenographer, I will apply the law as I may find it in the matter."
Briefs have since been presented.
While it is impossible to understand why this man should have conveyed his interest in a property, the title to which was in his wife and himself as joint tenants, the fact remains that he did so convey it.
The testimony of Mr. and Mrs. Garrison that he was sober at the time of executing the deed is convincing and I find that he was not intoxicated at that time. The testimony of Mr. Garrison as to the execution of the paper shows that it was executed and acknowledged with all due formality and that Kramer was fully informed as to the contents of *Page 142 
the paper he was signing, and I cannot believe that portion of Kramer's testimony wherein he says that he thought he was signing a paper as a witness.
The conduct of these two people was such that it is difficult for me to believe the defendant's statement that there were no illicit relations between them. I am inclined to believe the complainant's statement that such illicit relations did exist. If so, this relationship explains his willingness or desire to execute the conveyance, but "it is generally held that the existence of an illicit or unlawful relation between the testator and a beneficiary is not enough, per se, to raise a presumption that the will (deed) was procured by undue influence."66 A.L.R., note on p. 243, with citations from many states, including New Jersey.
In Griffith v. Benzinger (Court of Appeals of Maryland),144 Md. 575; 125 Atl. Rep. 512, Mr. Justice Offutt said:
"The mere fact that a person maintained illicit relations with another in whose favor a testamentary disposition was made by such person does not in itself raise a presumption of law or of fact that such disposition was obtained by fraud or undue influence, and the general rule embodying that principle is set out in the following language in Alexander on Wills, par. 590:
"`The mere fact that illicit relations exist between a man and a woman raises no presumption of undue influence because of a testamentary disposition by one in favor of the other. It is not essential to a will or a deed that the motives which led to the act should be virtuous or that the object of the donor's bounty should be meritorious. To the argument that the influence of a mistress is illegal because it sprang from an unlawful relationship, it has been said that "however reprehensible such influences may be, if a testator voluntarily chooses to be actuated by them, it is a privilege he may enjoy under the law that secures to every one alike the right to dispose of his property without restraint upon his own judgment and conscience."'
"But the fact that such relations existed between the decedent and the sole beneficiary under the proposed will is a *Page 143 
fact to be considered in connection with other facts bearing upon the question in determining the weight and sufficiency of evidence adduced to show that a will was made as a result of undue influence or fraud.
"The weight to be given such a fact must depend largely on the other facts which accompany it, and the circumstances of each particular case, and no more specific or definite rule than this can be formulated, that is, that while the existence of such relations between a testator and a beneficiary under his will is not in itself and by itself sufficient to support an inference that the will was the result of fraud or undue influence, yet it is sufficient to throw suspicion upon the will and to intensify the care and diligence with which courts should examine the facts relating to the execution of it under such circumstances, and it may give to such facts a significance which they might not otherwise have."
It should be said that the testimony of the complainant was not convincing. His conduct upon the witness-stand, his manner of testifying, was such as to create doubt in the mind of the court as to the truth of his statements. His apparent desire to convince the court that he had been guilty of illicit relations with the defendant prior to his marriage and his continuance of such relations, almost from his marriage night, casts suspicion upon his entire testimony. There is no testimony or intimation that he was mentally incompetent and in the absence of further proof sufficient to set aside the deed, the fact that he was a fool and did a foolish act is not sufficient to set the deed aside. Kelso v. Kelso, 95 N.J. Eq. 544; affirmed,96 N.J. Eq. 354.
The bill will be dismissed.
I will decline to allow any counsel fees in this matter. *Page 144