SHEARER *v.* HEALY

[No. 340, September Term, 1966.]

14

*Decided June 2, 1967.*

The cause was argued before HORNEY, MARBURY, BARNES, McWILLIAMS and FINAN, JJ.

*Spencer M. Beresford,* with whom were *Von Baur, Beresford & Coburn,* and *Howard Wood, David C. Bryan* and *Wood & Bryan* on the brief for appellant.

*William W. Beckett* and *James P. Salmon,* with whom were *Duckett, Orem, Christie & Beckett* and *John C. Joyce* on the brief for appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves the caveat to the will of Charles Byrne Finn who died, a resident of Queen Anne's County, on March

30, 1964, at the age of 60. The will, dated June 18, 1963, recited that all other wills were revoked and left the entire estate of the testator to "my good friend of long standing, Norbert I. Healy, 619 A Street, N. E., Washington, D. C. absolutely and in fee simple." Mr. Healy was made executor of the will.

The caveator, Lois Ellen Shearer, is the legatee of the testator's entire estate under an earlier will dated March 9, 1962. Mr. Healy, as administrator *pendente lite,* is the caveatee. At the conclusion of all of the evidence, the trial court (Keating, J.) reserved its rulings on the caveatee's motion to direct the verdict of the jury in his favor on the issues involving the execution of the will, the knowledge of its contents, mental capacity and of undue influence allegedly practiced on the testator by Mr. Healy. The jury found for the caveatee on the issues of execution of the will and knowledge of its contents; failed to reach a verdict on the issue of mental capacity; and found that the will of June 18, 1963, had been procured by Mr. Healy's undue influence. The trial court thereafter directed a verdict for the caveatee on the issue of mental capacity and also granted the caveatee's motion for a judgment, notwithstanding the verdict, upon the issue of undue influence, and ordered that the appropriate answer to that issue ("No") be entered. An appeal was timely taken from this action by the trial court. The only issue raised in this Court is in regard to undue influence, the caveator contending that there was sufficient evidence to justify the submission of this issue to the jury and to support the jury's verdict in her favor on this issue.

In our consideration of the facts in this case, we must resolve all conflicts in the evidence in favor of the caveator and must assume the truth of the evidence produced on her behalf, as well as all reasonable inferences which may be drawn from the evidence. *Ingalls v. Trustees of Mt. Oak Methodist Church Cemetery,* 244 Md. 243, 247, 223 A. 2d 778, 779 (1966).

Much of the testimony is undisputed, and establishes the following: The testator was born in Washington, D. C. and lived there until he was about 12 years old when his mother died. After his family divided, he went to live with a Mrs. Martina R. Haynes near Lanham in Prince George's County. He made his home with Mrs. Haynes, who was not a blood relative, for

16

approximately 40 years until her death, becoming her foster son.

In the latter part of 1961, Mrs. Haynes and the testator moved from the home in Lanham to a farm Mrs. Haynes had purchased in Queen Anne's County near Grasonville. Six weeks after moving, Mrs. Haynes died. Her will left the bulk of her property, including her real estate, to the testator absolutely, subject to the payment of various legacies. The testator sold the Lanham property for approximately $100,000 net after paying expenses and various legacies. He continued to live on the Queen Anne's County farm, worth approximately $35,000, until his death on March 30, 1964.

On March 9, 1962 the testator executed a will, prepared by Duckett, Orem, Christie and Beckett, by which he devised and bequeathed his entire estate to Mrs. Shearer, the caveator, of Landover Hills, Prince George's County, if she survived him, otherwise to her descendants. These provisions were preceded by the following statement: "In compliance with the express wish of Martina R. Haynes that I provide for Mrs. Lois Ellen Shearer, in greatful [sic] appreciation * * *." Most of the assets of the testator were received under the will of Mrs. Haynes.

The caveator, her husband and four sons, had moved to Landover Hills about the year 1943. Their home was approximately three miles from that of Mrs. Haynes. The Shearer family, Mrs. Haynes and the testator had become close friends by 1950. The Shearers referred to Mrs. Haynes as "Aunt Tina" and Mrs. Haynes often introduced Mrs. Shearer to strangers as "her daughter." Mrs. Haynes often said that she would like Mrs. Shearer "to be my daughter" and that "If I ever had a daughter I would like her to be just like Lois. [Mrs. Shearer]." Both Mrs. Haynes and the testator were fond of the Shearer children and made a habit of stopping in to see the Shearers when they went to town or otherwise passed the Shearer home. Mrs. Haynes and the testator often had dinner with the Shearers and spent many holidays with them. They would see the Shearers weekly. Mr. Shearer died in 1959 by which time three of the four sons had married. Mrs. Shearer continued to live at the home in Landover Hills with her fourth son, then 12 years of age.

Both Mrs. Haynes and the testator were great lovers of ani-

mals, especially horses and dogs. They had both horses and dogs at their home in Lanham and later at the Grasonville farm. The testator had a routine job sorting mail at the Washington, D. C. post office where he obtained night duty so that he could spend the day at home taking care of his many pets. Taking care of the animals and working out of doors were his principal diversions.

The testator had only about a sixth-grade education. He was straightforward and honest, was friendly but shy and prone to embarrassment. He was very close to his foster mother, Mrs. Haynes and depended on her to a great extent. He did not know how to cook and was not used to keeping the house inside, although, as indicated, he did outside work. Mrs. Haynes drove the testator from their Lanham home to his work. He disliked paper work and never handled any business matters of his own, Mrs. Haynes doing it all for him.

The testator had married an employee of the Post Office Department in Washington, D. C. This marriage was not successful and resulted in a mutually agreeable separation. There was no issue of the marriage. The wife predeceased the testator by a number of years, the date of her death not appearing in the record.

The testator retired from the Government service on disability around 1960. He had suffered a heart attack and was a diabetic. Because of his diabetic condition, he had been ordered by his physician not to consume alcohol in any form. Before Mrs. Haynes' death he had gone on drinking bouts from time to time. Mrs. Haynes disapproved of this conduct. After her death he stated that he would drink no more "until he got all this settled," and expressed concern over taking care of business matters relating to her estate. He visited Mrs. Shearer even more frequently and often spoke to her over the telephone when he did not see her.

Approximately two months after the death of Mrs. Haynes on December 14, 1961, the testator went to Mrs. Shearer's home and left a will with her which had been drawn at his request by his counsel, Duckett, Orem, Christie and Beckett. He told her that this will revoked an earlier will which left all of his estate to his sister. The sister, however, remained the sole bene-

ficiary of his insurance policies, amounting to $16,000, and was the joint owner of his personal bank account, which, at the time of his death, had a balance of between $2500 and $3000. The testator told Mrs. Shearer that he had made the new will because it disposed of the property which came to him from Mrs. Haynes who had expressly requested him to make Mrs. Shearer his beneficiary. Not long after this visit, the testator, on March 9, 1962, made a new will which again named Mrs. Shearer as sole beneficiary if she survived him, .and, as indicated, expressly stated that this was done in accordance with the wishes of Mrs. Haynes. The descendants of Mrs. Shearer were named as beneficiaries if she predeceased the testator. The testator left the will of March 9, 1962, with Mrs. Shearer and took back the previous will. He never asked Mrs. Shearer to return the March 9, 1962 will and spoke about it as late as eight days before he died.

The friendship between the Shearers and the testator continued until his death. He frequently consulted Mrs. Shearer about signing documents relating to the property he had received from Mrs. Haynes. Until the spring of 1963 it was customary for Mrs. Shearer and Mr. and Mrs. Earl Wagner (Mrs. Wagner, a nurse, had cared for the testator when he was seriously ill, and she and her husband were friends of the testator), to drive down to Queen Anne's County on Sunday, pick up the testator at his home and take him out to a meal at a restaurant or at the home of friends.

In early 1963, Mrs. Shearer observed certain changes in the testator's life. He saw his old friends less frequently. He began to drink again and his health deteriorated. In May, 1963, the testator began calling the Shearers and Wagners on Sunday mornings to ask them not to come down. He stated that the caveatee, Mr. Healy, was there; they had been drinking heavily; and, that women were there with whom he did not want Mrs. Shearer and Mrs. Wagner to associate.

The testator had known Healy when they were small boys living next door to each other in Washington, D. C. When they were in their teens, they did some camping with friends during the summer. The caveatee was also employed in the Washington general post office building and when he and the testator were

on the day shift, they sometimes had lunch together. However, they usually worked in different departments and on different shifts. The caveatee visited the testator from time to time in Lanham, but the transportation was difficult and the caveatee had to walk three miles after taking the train.

The caveatee retired during the latter part of August, 1962, at the age 58, losing 2% of his retirement annuity by reason of his early retirement. The caveatee testified that shortly after that he began spending at least four days a week with the testator at the Grasonville farm, usually from Wednesday noon until Sunday noon. When he was at the Grasonville farm, he did the cooking and kept the house. The testator did the yard work and took care of the animals. The testator told the caveatee that his sister, Margaret, had taken over the G. I. insurance policy ($10,000) and would pay the premiums due on it, and that his sister was the beneficiary of that policy and of the government insurance ($6,000). The testator discussed with the caveatee his attempts to sell the Lanham property, a few incidental things about the farm and the joint bank account with his sister.

In March, 1963, the caveatee drove the testator to Centreville to consult with Harry C. Butler, an attorney in general practice there, to obtain professional help on an income tax matter. This was the first time the testator had met Mr. Butler. On a number of occasions between March 1 and June 17, 1963, the testator stopped in to see Mr. Butler to chat.

Mr. Butler was called by the caveator, and testified that his day book indicated that the testator called at his office on June 17, 1963, and gave instructions for the preparation of the will contested in this case. The testator was alone when he gave Mr. Butler his instructions. Mr. Butler testified that the instructions were:

> "He told me he wanted to leave it [his property] to his friend, Mr. Healy, whom he had known all his life and had been very closely connected, and I asked him in reference to the executor of the Will and he had me name Mr. Healy, so it was a very short Will and a very simple Will and a very easily understood Will."

Mr. Butler recalled that the testator told him that he wanted to leave Mr. Healy "all his property, both personal and real estate." The testator paid Mr. Butler on June 17 for his services.

The testator did not discuss his family, or who his heirs at law would be if he died intestate, and did not mention anything about a prior will. Mr. Butler did not inquire about these matters. Mr. Butler further testified that at the time of the conference on June 17, the testator's "physical condition was quite normal," he spoke intelligently and that at no time had he seen the testator take a drink or detected the odor of alcohol on the testator's breath. The testator did not act unusually at all. Mr. Butler indicated that the testator "had a mind of his own" and, in his opinion, "he certainly could not be easily influenced." Mr. Healy never discussed the testator's will with Mr. Butler prior to the testator's death.

The testator, about noon on June 18, came to Mr. Butler's office to execute the will which the attorney had prepared. There had been no prior arrangements made for the execution of the will and Mr. Butler was not in his office. Mrs. Marcy Collier, who had formerly been Mr. Butler's secretary, was employed at that time by another attorney having an adjoining law office. The testator told Mrs. Collier that he was there to sign a will Mr. Butler had prepared for him. Mrs. Collier had seen the testator before, but could not remember whether she had taken the notes in regard to the will. She found the draft of the proposed will on Mr. Butler's desk. Leaving the draft in the testator's hands, she went to an adjoining office to get Mrs. Lillian B. Swann, a secretary, to come to Mr. Butler's office to act as the other witness to the will. Mrs. Swann testified that the testator was reading the draft of the will when she came in. She signed first and then Mrs. Collier. The testator thanked Mrs. Swann for "coming in and witnessing his signature to his will."

Both Mrs. Collier and Mrs. Swann were called as witnesses by the caveator. Mrs. Collier testified that there was no doubt in her mind that the testator was capable of making a will, he looked "in good shape" when she saw him. On the occasions she had seen the testator in Mr. Butler's office, she never saw

him under the influence of alcohol and never smelled alcohol on his breath. He spoke intelligently. When Mr. Healy was present in the office with him on prior occasions, she did not notice that the testator acted any differently than when he was by himself, and Mr. Healy did not appear to overbear him at all. Mrs. Collier also testified that when she returned to Mr. Butler's office with Mrs. Swann, the testator was reading the draft of the proposed will. She told the testator that "if he had any questions to please let me know," but he had no questions.

Mrs. Swann testified that she did not smell any alcohol on the testator's breath on June 18 and that she "was standing right alongside of him."

Mr. Butler testified that an envelope, with his return address, marked "Last Will and Testament of Charles Byrne Finn, Deliver to Norbert I. Healy" had been prepared at his home on the evening of June 17 and that it was his practice to put the executor's name on an envelope in which an executed will would be placed.

Mr. Healy testified that the testator asked him for a blank envelope, in which the testator put a document and asked Mr. Healy to keep it for him, stating that "I don't want to leave it around the house. I don't want it left here." He did not specify why he wanted this and did not state it was his will. At Mr. Healy's request, the testator wrote on the blank envelope that it was the testator's property. Thereafter, Mr. Healy took the paper, put it in his strong box at his home where it remained until the testator's death, after which Mr. Healy delivered it to William W. Beckett of Duckett, Orem, Christie and Beckett, who opened it in his presence. At that time Mr. Healy discovered that it was the testator's will devising and bequeathing the testator's estate to him and naming him as executor.

From the testimony, the testator apparently never mentioned the execution of the will of June 18, 1963, to any one other than to Paul Whitby, the tenant farmer of part of his Grasonville farm. Mr. Whitby testified that in June, 1963, the testator drove by in his automobile, stopped at the Whitby home and in the course of conversation told Mr. Whitby and his wife that "he had been up here to Mr. Butler's office and made a will." There

was no one with him and the contents of the will were not discussed. The testator, however, only eight days prior to his death, in conversations with Mrs. Shearer, the caveator, and with Mrs. Wagner, referred to the will of March 9, 1962, as disposing of his property. According to their testimony, the testator also indicated that the testator planned to save inheritance taxes and a possible contest of his will by his relatives by placing property in his name and that of the caveator as joint tenants, as this would take care of her, would permit her to work less and was in accordance with Aunt Tina's wish.

Mrs. Majorie Cantwell, who with her husband, John Cantwell, moved from upstate New York to a farm approximately two miles from the testator's Grasonville farm in December, 1963, testified that in November, 1963, she had telephoned the testator and inquired if she could put her ponies at his place temporarily, until they found a farm to rent. The testator replied that it would be all right but he couldn't take care of them as he was not well enough. The final arrangement was that the ponies would be put on the testator's Grasonville farm but Mr. Cantwell would stop by every day on his way to work to take care of them. When the Cantwells took the ponies in a truck to the testator's farm, Mr. Healy came out of the house and said: "We don't want those God damn ponies here. We just got rid of horses and we don't want any more." The testator didn't say much of anything and finally got into the car and said to Mr. Cantwell "Come on, John. We will take them somewhere else. I know where we can put them."

On a later occasion, the Cantwells stopped in one evening to see the testator at his home and Mr. Healy was there. While sitting in the living room, the testator was sitting on the couch and had his dog lying beside him. Mr. Healy said, "Get the damn dog off the couch." The testator stood up and the dog jumped down off the couch. The testator appeared to be embarrassed, so that the Cantwells told him they would see him some other time and left. Mr. Healy denied that any such episodes took place, but for the purposes of this case, we assume that they did as in the event of a conflict in the testimony, we accept the caveator's testimony as correct.

Mrs. Cantwell also testified that the night before the testa-

tor's death, he had dinner with them. The testator said he felt terrible, that he had been drunk the night before when Mr. Healy had been drinking with him. Here again, Mr. Healy denied that the testator drank anything but beer and not much of that. He further denied that there were ever any "wild parties" at the Grasonville farm. There were a number of witnesses for the caveatee who testified that they had never seen the testator intoxicated, smelled whiskey on his breath and that he had no reputation in the community as being a user of intoxicants. We accept, however, for the reasons already stated, the testimony produced by the caveator in this regard.

The Maryland law in regard to the required proof to establish undue influence vitiating a will was well stated by Judge (now Chief Judge) Hammond, for the Court, in *Stockslager v. Hartle,* 200 Md. 544, 547, 92 A. 2d 363 (1952), as follows:

"*** [U]ndue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and *must be exerted to such a degree as to amount to force or coercion,* so that free agency of the testator is destroyed. The proof must be satisfactory *that the will was obtained by this coercion* (although it need not be immediately exercised as of the date of the execution of the will if its influence causes its execution) or by importunities which could not be resisted, so that *the motive for the execution was tantamount to force or fear. Mere suspicion that a will has been procured by undue influence, or that a person had the 'power unduly to overbear the will of the testator' is not enough.* It must appear that the power was *actually exercised,* and that *its exercise produced the will.* The *burden of proof is on the caveator to meet these requirements of the law."* (Emphasis supplied).

The Court in *Stockslager* cited with approval and followed *Koppal v. Soules,* 189 Md. 346, 56 A. 2d 48 (1947). See also *Layman v. Conrey,* 60 Md. 286 (1883).

As has already been indicated, there is no challenge in this case in regard to the mental capacity of the testator to execute the will of June 18, 1963. Although the testator suffered from

various disabilities, including diabetes and arteriosclerosis, there is no evidence in the case that his mind had been substantially impaired. Dr. Evans, a witness for the caveator, gave the testator a general examination on July 23, 1963, several weeks after the will in question had been executed, and concluded that the testator suffered from nervousness. He declined to testify that the physical condition of the testator had impaired his mental faculties. The testator spoke coherently and was cooperative. The testator stated to Dr. Evans at the time of the interview on July 23 that "he used to drink heavily but had had nothing in three months."

Mrs. Shearer, the caveator, testified that the testator "was a shrewd person" and "was intellectual." Her son, John, testified that the testator was "a very friendly, very deep man." He was obviously able to execute contracts and understand their nature, although business matters "worried him."

Taking the evidence in the light most favorable to the caveator, the most it shows was that in 1963, Mr. Healy, a lifelong friend of the testator, resided with the testator for part of each week, was a drinking companion and at times had women visit at the Grasonville farm. Some months after the will was executed there were two occasions—the "pony" and "dog" episodes—when Mr. Healy seemed to dominate the situation at the Grasonville farm. However, the uncontradicted evidence of witnesses called by the caveator indicates that when the will of June 18, 1963, was executed, Mr. Healy was not present. He was not present when the interview with Mr. Butler in regard to the provisions in the will occurred on June 17, 1963. The testator clearly understood the terms of the will of June 18, read it and, at the time of its execution, was possessed of testamentary capacity and obviously was not under the influence of anybody. Mr. Butler, a witness for the caveator, testified that the testator had a mind of his own and did not appear to be a person easily influenced. He testified that the testator had not been drinking, "had a good personality, will power" and "was able to express himself, knew what he wanted and when he wanted it."

The caveator urges that Mr. Healy stood in a confidential relationship with the testator and this raises a presumption of

undue influence. Our predecessors, however, have held that in Maryland this presumption—present when a gift *inter vivos* is involved—does not extend to a testamentary disposition. As Judge Collins, for the Court, stated in *Cook v. Hollyday,* 185 Md. 656, 667, 45 A. 2d 761 (1946) :

> "However, there is an obvious difference between a gift whereby the donor strips himself of the enjoyment of his property while living and a gift by will, which takes effect only from the death of the testator. In cases of gifts by will the fact that a party is largely benefited by a will prepared by himself is nothing more than a suspicious circumstance of more or less weight according to the facts of the case."

The evidence in the present case does not indicate that Mr. Healy was in a confidential relationship with the testator. Rather, it indicates that Mrs. Shearer was in that position as she, herself, testified she was the one person he could trust and he felt close to me and that was his reason for wanting me to take care of everything and have everything." The testator did consult Mrs. Shearer in regard to many of his business transactions. He apparently only mentioned a few business matters to Mr. Healy and there is no evidence that he sought his advice and followed it in regard to those matters.

Even assuming, *arguendo,* that Mr. Healy was in a confidential relationship with the testator, there is no evidence that he abused this relationship, or, indeed, even knew that he was the beneficiary under the will of the testator, until after the testator's death.

There is no contention that there was any illicit relationship between Mr. Healy and the testator. Even when such a relationship exists, we have said that "neither such relationship nor an unjust or unnatural disposition of property is sufficient *per se* to warrant a conclusion of undue influence." *Stockslager v. Hartle, supra,* 200 Md. at 552, 92 A. 2d at 366.

The caveator contends, also, that the will of June 18, 1963, is unnatural or unjust. We do not agree. The evidence establishes that the testator was not disposed to favor his brothers and sisters in bequeathing or devising his property. His sister,

Margaret, was given his insurance policies and the joint bank account, but neither she, nor the other heirs at law of the testator were the beneficiaries under the will of June 18, 1963, or the two prior wills of the testator. The heirs at law are not caveators. The caveator is no more related by blood to the testator than is the caveatee. Indeed, the testator knew and was friendly with the caveatee for a far longer period than with the caveator. Mr. Healy was described by the testator as "a friend," and his testamentary disposition to him is not unjust or unnatural under the circumstances of this case.

The facts in the case at bar readily distinguish it from *Mecutchen v. Gigous,* 150 Md. 79, 132 Atl. 425 (1926) and *Griffith v. Benzinger,* 144 Md. 575, 125 Atl. 512 (1924), relied on by the caveator. In *Griffith,* the testator was 76 years of age, was "almost helpless" because of a chronic and progressive ailment and depended heavily on his mistress, who was also his nurse. The factual situation is quite different in the present case. In *Mecutchen,* the testatrix was a 76 year old widow, who lived at the home of her friend, the principal beneficiary under the will. There was evidence that the testatrix had a weak mind when the will was executed and that the beneficiary friend kept the testatrix continuously in her presence and further that the will itself appeared to make an inadequate provision for the demented daughter of the testatrix. The situation is quite different in the present case.

We have recently considered the question of alleged undue influence in obtaining the execution of a will in *Ingalls v. Trustees of Mt. Oak Methodist Church Cemetery, supra* and in *Sachs v. Little,* 245 Md. 343, 226 A. 2d 283 (1967). In our opinion, there was even less evidence of undue influence in the present case than there was in either of the two cases mentioned, in which we held that the trial court properly directed the verdict on that issue for the caveatee. See also *Arbogast v. MacMillan,* 221 Md. 516, 521, 158 A. 2d 97, 100 (1960) cited with approval and followed in both *Ingalls* and *Sachs.*

*Orders appealed from affirmed, costs to be paid by the appellant.*