## STOCKSLAGER *v.* HARTLE

[No. 14 October Term, 1952.]

*Decided November 7, 1952.*

The cause was argued before MARKELL, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Charles F. Wagaman,* with whom was *John Wagaman* on the brief, for the appellant.

*Omer T. Kaylor, Sr.,* with whom was *Omer T. Kaylor, Jr.,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Paul C. Stockslager, the appellant, challenged the validity of his sister's will in the Circuit Court for Washington County, he being her only close relative, and having been left but $100 of her estate. The rest was given to the appellee, a practical nurse who had nursed and befriended testatrix' mother and, after the death of the mother, the testatrix. The case went to the jury on the issues of undue influence and fraud all other issues having been abandoned by the caveator. The jury found in favor of the caveator and a motion for judgment *n.o.v.* was made. The court, weighing the evidence presented by the caveator in a light most favor-

able to him, found that it did not tilt in his favor the scales prescribed by the law for such cases, and entered judgment for the caveatee. We think his determination and his action right.

Appellant did not seriously argue that fraud was present, and we find no evidence in the case to substantiate a verdict on that issue. The standards described by the law for the testing of whether or not a will has been procured by undue influence were set forth by this Court recently in the case of *Koppal v. Soules*, 189 Md. 346, 56 A. 2d 48. In that case, the Court said that undue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and must be exerted to such a degree as to amount to force or coercion, so that free agency of the testator is destroyed. The proof must be satisfactory that the will was obtained by this coercion (although it need not be immediately exercised as of the date of the execution of the will if its influence causes its execution) or by importunities which could not be resisted, so that the motive for the execution was tantamount to force or fear. Mere suspicion that a will has been procured by undue influence, or that a person had the "power unduly to overbear the will of the testator" is not enough. It must appear that the power was actually exercised, and that its exercise produced the will. The burden of proof is on the caveator to meet these requirements of the law.

The Stockslager family for some fifty years has lived in Funkstown, Washington County. George and Ella Stockslager, the parents of the caveator and the testatrix, had only those two children. The father died in 1927. After his death, the mother, Ella Stockslager, and her daughter Mary, the testatrix, lived together, and the son Paul, the caveator, lived nearby. The mother had made a will by which she left all of her property, which was mainly the house in which she lived, to her daughter Mary, with the execption of $100.00, bequeathed Paul. The mother suffered a paralytic stroke

shortly before Christmas in 1948. Soon after, Paul Stockslager employed Daisy C. Hartle, the appellee, as a practical nurse. She was on eight hour duty for the first two weeks, but thereafter, until the death of Ella Stockslager in March 1949, she was on twenty-four hour duty. She received $25.00 a week when she was first employed and was paid nothing additional during the months she served as a twenty-four hour nurse for Mrs. Stockslager. Mary Stockslager Schriver was employed in Hagerstown. She was, from time to time, incapacitated as a result of a heart condition, caused by a rheumatic heart, and on those occasions Daisy Hartle would take care of both mother and daughter. Seemingly, Miss Hartle not only acted as nurse, but took charge of and ran the house.

In May, 1949, about a month after the death of Mrs. Stockslager, the testatrix executed a will which was witnessed by neighbors to whose house she went for the purpose, in which she left all of her estate to Daisy Hartle. This will was shown to Miss Hartle and either by her or by the testatrix was delivered to the Register of Wills for Washington County for safekeeping. It is contended on the one hand, and denied on the other, that Ella Stockslager wished Mary to leave her estate to Daisy Hartle, if Daisy was as kind to her as the mother seemed to feel she would be. It is clear however, that Mary, herself, thought definitely that this was her mother's wish, and so told various people.

In July 1951, the testatrix fell, broke her hip, and was taken to the Washington County Hospital. She died there unexpectedly on August 30, 1951, being then 43 years of age. While in the Hospital, on August 22nd, she telephoned to Mr. Harry Newcomer, the Register of Wills for Washington County, and asked him to come to the Hospital and bring with him her will of 1949. She asked him to write another will and gave him directions as to what she wished it to contain. She told him she wanted to give her brother Paul $100.00 and to give the rest and residue to Daisy C. Hartle,

but in case Daisy Hartle did not survive her, her property was to go to a cousin in Ohio named Orran Sine. The testatrix had known Mr. Newcomer, who was on the Board of the Hospital when she had been employed there some years before. No one was present in the hospital room when the interview between Mr. Newcomer and the testatrix took place. Mr. Newcomer went to his office, had the will which is here challenged written, and took it to the Hospital for her signature. He gave her the will, asked her to read it, asked her if she understood everything in it, and if it was what she wanted. She replied that it was. The will was witnessed by two disinterested witnesses, acquaintances visiting a patient nearby. No one was present at the execution of the will except the testatrix, the two witnesses and Mr. Newcomer.

Both the will of 1949 and the will of 1951 were executed when the caveatee was not present. The caveator attempts from testimony of a number of witnesses to show that nevertheless the mind and will of the testatrix then was controlled or dominated by the caveatee. The evidence relied on to establish this is directed to the unusually affectionate friendship between Mary Stockslager Schriver, the testatrix, and Daisy C. Hartle, the caveatee. It is related by a number of witnesses that Mary would call Daisy "Mommy", "Sweetheart", and "Darling", and that when they met or parted, they would embrace and kiss. The testimony also stresses the fact that when Daisy Hartle left after visiting Mary, the latter would watch until the bus which the visitor had taken passed the house, and wave to her. Mary Stockslager Schriver relied on Daisy Hartle for advice and counsel, frequently asking her what she should or should not do, as problems arose. Daisy Hartle would telephone Mary after the latter had visited her or she had visited Mary, to see whether or not she had returned safely home or had gone to bed. At times, Daisy Hartle would seem to interfere with friendships between Mary and those who had pre-

viously been close to her. It is said by the caveator that this was evidence of domination and control, as were the facts that the testatrix gave written instructions to Daisy Hartle that she was to have authority to make all arrangements for her burial, and also gave her the key to her safe deposit box and written authority to gain entrance to that box.

It is apparent that Daisy Hartle rendered great and kind service to the mother of the testatrix in her last illness, and that she was kind and affectionate to the testatrix herself. As has been said, the health of Mary Stockslager Schriver was poor, and, from time to time, she required care and attention. She had planned, when she left the hospital in 1951, to go to the home of Daisy Hartle for recuperation. It is plain that Mary Stockslager Schriver had affection for Daisy Hartle, which was greater than might normally be expected, relied upon her advice, and had great confidence in her. At times the testatrix wanted to keep from Daisy Hartle facts which she thought would displease her. It is probable that Daisy Hartle, who was in her sixties, gave the testatrix the affection she formerly received from her mother and that, to a substantial extent, Daisy Hartle occupied a mother's role in the mind and heart of the testatrix. It is contended by the caveator that relations between him and his sister were normal and friendly until Daisy Hartle came into the picture, and that thereafter they deteriorated greatly. It can fairly be said, however, that they were not ever closely attached to one another. It is most certain that Mary Stockslager Schriver never wanted her brother to receive any of her property, and that the only reason she bequeathed him $100.00 was because of a theory she had that, if she did not leave him something, he could break her will.

The case in some aspects may be said to be analogous to the case of *White v. Bramble,* 124 Md. 395, 92 A. 763, 765. There, the testator left his house and the bulk of his personal estate to two nieces who had lived

with him for a number of years, one acting as housekeeper. The nearest surviving relatives of the testator were his brother and three sisters who received nominal legacies. The will was attacked on the ground of undue influence of the niece, who had been the housekeeper. The court there said:

"The evidence in the record does not in our judgment tend to sustain the charge of undue influence. It shows that Miss Snyder was rather excessive in her manifestations of affection for her uncle; that she spoke of her ability to influence his judgment by her advice in reference to investments, and of the fact that certain gifts which he made to relatives had been reduced in amount at her suggestion; that she had entire management of the house, opened her uncle's mail, and had authority to fill up checks which he would sign in blank. The record is too voluminous to admit of more than a general reference to this feature of the case. It must be sufficient for the purpose of this opinion to state our conclusion upon the evidence that, while it shows the testator to have had the most implicit confidence in his niece, and to have been quite responsive to her advice and suggestions, there is nothing in the proof to warrant the inference that she took any improper advantage of her position or that her influence controlled her uncle's judgment and volition in the final disposition of his estate. It is agreed by all the witnesses that Mr. White was a man of strong personality. The evidence as to the character of the testator and as to the circumstances under which his will was made is inconsistent with the theory that it was not his free and voluntary act."

It is admitted in this case that Mary Stockslager Schriver was a woman of strong will and purpose, and had been from childhood, and that her mind was

552

clear and acute. The caveator attempts to show that this strong will and purpose melted under the influence of Daisy Hartle, but the testimony of his witnesses on this point is either unsupported opinion or is based on facts which permit no more than a speculative or conjectural conclusion.

The evidence to support the caveator's theory (not strongly pressed in argument) that there was not a normal relationship between Mary Stockslager Schriver and Daisy Hartle is likewise entirely speculative and conjectural. In cases of concededly illicit relationships, this Court has said that neither such relationship nor an unjust or unnatural disposition of property is sufficient *per se* to warrant a conclusion of undue influence. In situations where there is evidence of external acts of fraud or undue influence, and particularly where the capacity of the testator was impaired, such relationship would be of great weight. See *Saxton v. Krumm,* 107 Md. 393, 68 A. 1056, 17 L. R. A., N. S., 477. No such facts, or lack of capacity, are here present. If a testator is competent and is exercising his own free agency, he may leave his property to whom he pleases, and the fact that the disposition is not to a member of the family does not necessarily make it an unjust disposition. *Green v. Michael,* 183 Md. 76, at 85-86, 36 A. 2d 923. The record furnishes no basis for inference that the relationship between Paul and his mother and sister was so close that he could have, as a matter of course, expected to be their beneficiary. The mother did not leave any substantial part of her estate to him, and his sister had a fixed purpose, often expressed, that he should receive no part of hers. For an example of what might be called an unnatural disposition, which was held to be valid, see *Green v. Michael, supra* and *Drury v. King,* 182 Md. 64, 32 A. 2d 371, where the testator left his wife her legal share of his estate and disinherited his six children in favor of Mrs. Drury, at whose home he had stayed for some time. The court sustained this testamentary disposition against the at-

tack that it was due to undue influence, saying that, since there was a concession that the testator was mentally competent, even as there is here, "we do not find that the facts in evidence as to undue influence amount to any more than suspicions that Mrs. Drury had subjugated his will to hers". The Court then went on to adopt the language of *Malone v. Malone,* 148 Md. 200, at 208, 129 A, 10 at page 13, as follows:

"* * * mere conjecture, or a suspicious circumstance, or even an influence, or constraint, if not directly connected with the will in the sense of being its procuring cause, will not be sufficient. The will of a competent person cannot be nullified on the ground of undue influence, without affirmative evidence of sufficient probative force to carry to a mind the reasonable conviction of its existence and that it induced the action of the testator."

In the view we take of the case, there can be no more than suspicion that the will of Mary Stockslager Schriver was executed by her because of undue influence. The effort of the caveator to prove undue influence is made much more difficult by the fact of the execution of the first will in 1949. There is little if any testimony which could afford even a suspicion or conjecture that prior to its execution Mary's will had been subjudgated to Daisy Hartle's. Almost all of the evidence of the caveator is directed to events and to conditions which occurred after the making of the first will. The manifest and unchanged purpose of the admittedly competent testatrix to leave her property to Daisy C. Hartle and the independent preparation of both wills, considered in connection with lack of substantial evidence, lead us to the conclusion that the action of the lower court was correct.

The judgment below is affirmed.

*Judgment affirmed, with costs.*