822 A.2d 506

Kurt ORWICK

v.

Alan MOLDAWER, Personal Representative
of the Estate of Dana B. Orwick.

No. 61, Sept. Term, 2002.

Court of Special Appeals of Maryland.

May 1, 2003.

Kurt Orwick, Gainesville, FL, for appellant.

John Marshall (Moldawer & Marshall, P.C., on brief), Rockville, for appellee.

Submitted before SONNER, ADKINS and GREENE, JJ.

SONNER, J.

Appellant, Kurt Orwick, is the oldest son from the first marriage of the decedent, Dana B. Orwick. Kurt challenged his father's will, arguing that his half-sister, Jacqueline ("Jackie") A. Orwick, exerted undue influence on their father when he signed the will a few days prior to his death. At the close of Kurt's case, the personal representative of the estate, Alan Moldawer, moved for judgment, and the Circuit Court for Montgomery County granted the motion. Kurt presents two questions for our review, which we reword as follows:

I.   Whether the evidence presented at trial by him, together with the inferences that could reasonably be drawn from that evidence, when viewed in the light most

favorable to him, established a prima facie case of undue influence on the part of Jacqueline Orwick, thus precluding the grant of a motion for judgment at the close of his case.

II. Whether hospital records containing a nurse's notation, stating that on the day Dana Orwick executed his will, he was suffering from "periods of confusion and forgetfulness," was admissible under Maryland Rule 5–803(6).

We find no error and affirm.

### Factual Background

Dana lived in Bethesda, Maryland, with his daughter, Jackie. Jackie's mother was Dana's second wife, and the couple had another child, Jackie's older brother, Michael H. Orwick. Kurt Orwick is Dana's son from his first marriage and lives in Florida. On May 15, 2000, the father was admitted to Sibley Memorial Hospital and diagnosed with terminal cancer. He died on May 27, 2000.

On May 24, 2000, three days prior to his death, Dana signed a will that referenced his son, Kurt, only once. The will established Kurt as a trustee for Kurt's son, Randall B. Orwick, to whom Dana gave his "library and record collection." Michael and Jackie loosely divided the remainder of Dana's estate. Bianca Boone and Rosamae McKinnon, housekeepers employed by a Sibley Hospital contractor, Employment Maid Service, witnessed the will. There is no dispute that the will satisfies the formalities of will execution. *See* Md.Code (1974, 2001 Repl.Vol.), Est. & Trusts, § 4–101, *et seq.*

Kurt petitioned to caveat the will in the Orphans' Court for Montgomery County, alleging that Dana was not competent to make a will and that Jackie and Michael had exerted undue influence on their father. These questions were sent to the circuit court for a jury trial. The trial commenced on February 20, 2002, and, at the close of Kurt's case on the second day, Moldawer moved for judgment, which the court granted,

after concluding that Kurt had not made out a case of undue influence by Jackie.[1] This appeal followed.

## Discussion

Maryland Rule 2–519 states:

(a) **Generally.** A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case.

(b) **Disposition.** When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

We review the grant of a motion for judgment under the same standard as we review grants of motions for judgment notwithstanding the verdict. *Johnson & Higgins of Pa., Inc. v. Hale Shipping Corp.,* 121 Md.App. 426, 450, 710 A.2d 318 (1998) (citation omitted). We assume the truth of all credible evidence on the issue, and all fairly deducible inferences therefrom, in the light most favorable to the party against whom the motion is made. *Nissan Motor Co. Ltd. v. Nave,* 129 Md.App. 90, 116–17, 740 A.2d 102 (1999) (citations omitted), *cert. denied,* 357 Md. 482, 745 A.2d 437 (2000).

---

1. Kurt withdrew the issue of whether Michael had exerted undue influence on his father and concedes on appeal that the circuit court's grant of judgment on the testamentary capacity issue was not erroneous.

Consequently, if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, the case must be submitted to the jury for its consideration. *Washington Metro. Area Transit Auth. v. Reading,* 109 Md.App. 89, 99, 674 A.2d 44 (1996) (citation omitted).

The Court of Appeals has stated that "undue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and must be exerted to such a degree as to amount to force or coercion, so that free agency of the testator is destroyed." *Anderson v. Meadowcroft,* 339 Md. 218, 228, 661 A.2d 726 (1995) (citations omitted). The Court has drawn a clear line of distinction between *inter vivos* gifts and testamentary gifts. *Griffith v. Diffenderffer,* 50 Md. 466, 484 (1879). In *Griffith,* the Court of Appeals stated:

> In the cases of gifts or other transactions *inter vivos,* it is considered by courts of equity, that the natural influence which such relations as those in question involve, exerted by those who possess it, to obtain a benefit for themselves, is an undue influence. The law regarding wills is very different from this. The natural influence of the parent or guardian over the child, or the husband over the wife, or the attorney over the client, may lawfully be exerted to obtain a will or legacy, so long as the testator thoroughly understands what he is doing, and is a free agent.

*Anderson,* 339 Md. at 228, 661 A.2d 726 (quoting *Griffith,* 50 Md. at 484).

"Generally, undue influence amounts to physical or moral coercion that forces a testator to follow another's judgment instead of his own." *See Moore v. Smith,* 321 Md. 347, 353, 582 A.2d 1237 (1990) (citation omitted). Recognizing that it never "laid down a test to determine the existence of undue influence with mathematical accuracy," in *Moore v. Smith,* the Court of Appeals collected a list of seven factors "recognized in many appellate cases" as characteristic of the presence of undue influence. 321 Md. at 353, 582 A.2d 1237.

1. The benefactor and beneficiary are involved in a relationship of confidence and trust;
2. The will contains substantial benefit to the beneficiary;
3. The beneficiary caused or assisted in effecting execution of the will;
4. There was an opportunity to exert influence;
5. The will contains an unnatural disposition;
6. The bequests constitute a change from a former will; and
7. The testator was highly susceptible to the undue influence.

*Anderson,* 339 Md. at 229, 661 A.2d 726; *Moore,* 321 Md. at 353, 582 A.2d 1237.

Although the Court of Appeals in *Moore* catalogued evidence supporting each factor, it seemed clear in the Court's opinion that *Moore* was not establishing a bright-line test. 321 Md. at 353, 582 A.2d 1237 ("Although we have not laid down a test to determine the existence of undue influence with mathematical accuracy, we have recognized in many appellate cases several elements characteristic of its presence."). Subsequent opinions by the Court of Appeals, however, seem to elevate the existence of a confidential relationship and the testator's high susceptibility to the undue influence to bright-line status. In *Anderson,* the Court, after noting that the first six characteristics were alleged in the complaint, dismissed the complaint based upon the absence of sufficient facts to establish the testator's high susceptibility to the undue influence. 339 Md. at 229, 661 A.2d 726. In *Upman v. Clarke,* the Court of Appeals appears to have reached the same conclusion regarding a confidential relationship. 359 Md. 32, 41–2, 753 A.2d 4 (2000).

There are two possible interpretations of the law that can emerge from this line of cases. The first, and we would guess the approach that Moldawer, the appellee, would argue, is that each enumerated undue influence factor must be present. The second, a position Kurt, the caveator/appellant, would

assert is that some factors may be more important than others, but, by no means does the law require the presence of all the factors. Kurt has conceded that there is no evidence of a prior will; therefore, factor six, a change from a former will, is not present. Consequently, if we accept the stricter interpretation, Kurt's claim fails.

We conclude that the second approach is better reasoned; the Court of Appeals did not intend *Anderson* and *Upman* to stand for the proposition that all seven factors must be present for caveators to sustain their burden. We need not speculate on what factors may or may not be required. We do, however, decide that, whether or not the new will changes or eliminates a prior will is not an indispensable factor, and undue influence may be present absent a will change.

■ In any case, we must now review the evidence at trial and determine whether a reasonable jury could conclude, on the facts presented, that Jackie Orwick exerted undue influence. If factors one and seven are not present, then the circuit court properly dismissed the action. We are, of course, required to read the evidence and the inferences therefrom in favor of Kurt, who lost below. Our review of the evidence leads us to the conclusion that Kurt presented sufficient evidence to allow a jury to find that the will confers substantial benefit on Jackie, that Jackie caused or assisted the execution of the will, that she had an opportunity to exert influence, and that the will contains an unnatural disposition of Dana's assets.

Evidence at trial indicated that Dana's estate, after taxes and debt satisfaction, totaled roughly $653,000. Had Dana died intestate, his three surviving children would have divided that sum equally among themselves, each receiving about $217,666. Under the will, Jackie and Michael divided the $653,000, each receiving about $326,000, an increase of $108,834, roughly a fifty percent increase over their intestate share.

A jury could also find that Jackie assisted in the execution of the will. Jackie instructed her father where to sign the

document she placed in front of him, she actively sought out the location of the will by contacting her father's attorney, and she requested that the hospital provide witnesses to sign the will. We note that these activities, by themselves, do not at all even hint of undue influence; however, these facts, taken together with other factors, could support a reasonable jury's finding that Jackie exerted undue influence.

We also believe that there was sufficient evidence for a jury to conclude that Jackie had the opportunity to exert influence. Jackie began living in the house with her father in 1999, and brought her boyfriend and his children with her. Kurt testified that between May 15 and May 23, Jackie consistently told him not to come to see his father. Again, the inference must be drawn in Kurt's favor. Although this evidence alone is not indicative of undue influence, this is merely one factor that may support a belief that Jackie could have exerted undue influence.

Finally, the will does contain an unnatural disposition of Dana's assets by completely cutting Kurt out of the will. *See, generally, Rowe v. Rowe,* 124 Md.App. 89, 94, 720 A.2d 1225 (1998) (remarking on the common law presumption against disinheritance of heirs at law) (citations omitted). Although this division of the estate might have been understandable, given the lack of contact between Dana and Kurt between 1995 and 1999, Kurt testified that he and his father had begun to rebuild that relationship. In October 1999, Kurt and his wife visited Dana in Maryland, and his father visited Kurt in Florida in February 2000.[2] We believe that, given this father-son relationship, the inference exists that the disposition of the father's assets was unnatural.[3]

---

**2.** The testimony is not very clear on this point. It appears, however, that Dana visited with Kurt in Florida. According to the testimony, this was the second visit between father and son and must have occurred some time after October 1999, because the October visit was the first visit since 1995.

**3.** Paragraph six of the will indicates an intent on Dana's part to exclude Kurt because "he has become well-provided for in his own way."

We must now turn to the more demanding factors of a confidential relationship and that Dana was highly susceptible to undue influence. This burden rests on Kurt, and at no time shifts to Moldawer or Jackie. *See Upman,* 359 Md. at 43, 753 A.2d 4 (quoting *Stockslager v. Hartle,* 200 Md. 544, 547, 92 A.2d 363 (1952), and *Koppal v. Soules,* 189 Md. 346, 351, 56 A.2d 48 (1947)). This burden is heavy because testamentary gifts are natural and expected, and people who receive gifts under a will, usually a parent, child, spouse, sibling, close friend, or trusted employee, often stand in a fiduciary or confidential relationship with the testator. *See Upman,* 359 Md. at 44, 753 A.2d 4.

The Court of Appeals has not often defined the contours of a "confidential relationship." *Id.* at 41, 753 A.2d 4 ("We have spoken often about confidential relationships, but we have rarely attempted to define the concept."). It appears that dependence is the key factor because, in *Green v. Michael,* 183 Md. 76, 36 A.2d 923 (1944), the Court of Appeals stated that "[t]o establish such a relationship there must appear at least a condition from which dependence of the grantor may be found." *Id.* at 84, 36 A.2d 923 (citations omitted). The Court in *Green* went on to say that "a confidential relationship may be presumed whenever two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other." *Id.; see also Tracey v. Tracey,* 160 Md. 306, 318, 153 A. 80 (1931) (stating that a confidential relationship may be presumed when one person "must from the very necessities of the situation repose confidence in the other, and where the one in whom such confidence is reposed is thereby enabled to exert a dominating and controlling influence over the other").

Generally, the Court of Appeals has been concerned with when a confidential relationship may be presumed or found. *Upman,* 359 Md. at 42, 753 A.2d 4. In relationships similar to attorney-client and trustee-beneficiary, the confidential rela-

---

Nevertheless, the complete exclusion of Kurt is generally viewed as unnatural, and we will view this factor in his favor.

tionship is presumed to exist. *Id.* "Otherwise, and particularly in family relationships, such as parent-child and husband-wife, the existence of a confidential relationship is an issue of fact and is not presumed as a matter of law." *Id.* (citing *Sanders v. Sanders*, 261 Md. 268, 276, 274 A.2d 383 (1971)).

In *Upman*, the Court of Appeals concluded, based on the admissions of the parties, that a confidential relationship existed. 359 Md. at 42, 753 A.2d 4. Genevieve Upman had moved in with her nephew, Kenneth Clarke, and his wife, Patricia Clarke, after it was determined that Ms. Upman could no longer live alone. The dispute was between Mr. Clarke and other nieces and nephews of Ms. Upman over a change in distribution of trust assets held by Ms. Upman. After moving in with the Clarkes, Ms. Upman depended on them for her daily activities—dressing, eating, bathing, and going to the bathroom—and Mr. Clarke assumed control of Ms. Upman's checkbook and bill payments. Thus, the relationship between the Clarkes and Ms. Upman illustrates a confidential relationship because Ms. Upman was dependent on the Clarkes for many of her activities.

*Sellers v. Qualls*, 206 Md. 58, 110 A.2d 73 (1954), provides another example of a confidential relationship. The will of Cora A. Hinson Dunn was challenged by her surviving brothers and sisters and the daughter of a deceased sister. Dunn left her real property to the Bethel Pentecostal Church, headed by the Reverend Claude R. Qualls. Reverend Qualls had been Dunn's negotiator on several deeds for the sale of land. They talked often in private, and Rev. Qualls conducted most of Dunn's business affairs. Reverend Qualls selected the attorney who wrote the will devising Dunn's property to the church and, on several occasions, Rev. Qualls conducted business for Dunn at her bank and took her to the doctor. The Court concluded that this was a confidential relationship. *See Sellers*, 206 Md. at 71, 110 A.2d 73.

Finally, *Shearer v. Healy*, 247 Md. 11, 230 A.2d 101 (1967), illustrates what is not a confidential relationship sufficient to sustain a caveator's burden. Charles Byrne Finn had inherit-

ed a large estate from his adoptive mother, Martina R. Haynes, and had a will that devised the remainder of the estate at his death, at the request of Ms. Haynes, to a family friend, Lois Ellen Shearer. Almost a year before his death in 1963, Finn revoked all prior wills and left the estate to a drinking companion and boyhood friend, Norbert I. Healy. Finn did not conduct his own affairs, but, rather, for some time, had Shearer conduct his business for him and, after retiring in 1962, Healy kept up Finn's house and did the cooking. The Court concluded that, although Healy and Finn discussed some business matters and their relationship was close, no confidential relationship of the kind sufficient to show undue influence was present. Instead, the court found that the type of confidential relationship that would bear on the issue of undue influence was between Shearer and Finn. Shearer testified that Finn trusted her and "that was his reason for wanting [her] to take care of everything and have everything." *Shearer,* 247 Md. at 25, 230 A.2d 101. Consequently, the court found that Healy could keep his bequest because no confidential relationship was abused.

We believe that these cases draw a line beyond the reach of the evidence in this case. The inquiry regarding the existence of a confidential relationship in the undue influence context centers on relationships in which the testator reposes trust and confidence in another regarding the testator's assets and bounty. Clearly, a confidential relationship can develop in a myriad of circumstances that have nothing to do with the assets of an estate. *See* I Scott on Trusts, § 2.5 (1987) (noting that a confidential relationship will exist wherever one person has gained the confidence of the other and purports to act or advise, with the other's interest in mind); *see also Shearer,* 247 Md. 11, 230 A.2d 101. Indeed, the mere existence of a familial relationship is not indicative of a confidential relationship. *See* 3 Bowe–Parker: Page on Wills, § 29.84 (1961). The issue is whether a level of trust and confidence exists between two people to the point that the testator trusts another to conduct the testator's business and that trusted

person abuses that trust in some way to gain a benefit in the testator's will.

There is simply no evidence to support even the inference that Jackie maintained a confidential relationship with her father of the kind sufficient to sustain Kurt's burden. There was no testimony that Jackie took over Dana's day-to-day financial decisions. Furthermore, the notes taken by her father's attorney on November 24, 1999, indicate that her father had every intention of excluding Kurt from his will and came to Moldawer's office alone. Correspondence between Moldawer and Dana indicate that the earliest time that a will would have been signed was January 2000. Moldawer testified that Dana did not have a draft will in his hands until probably early February 2000. All this evidence indicates that Dana Orwick was very much in control of his finances and estate and sought the financial advice of an attorney, not that of his daughter.

The only evidence introduced to support the finding of a confidential relationship is that Jackie moved into her father's home in May 1999. There was no testimony as to why she did this, what responsibilities she undertook, or what impact this had on her father. Although Jackie was employed by her father to assist in his home consulting work for the Aspen Institute for Humanistic Studies, there was no testimony at all as to the impact of this relationship on the present dispute. What appears to be the linchpin of Kurt's confidential relationship argument, the power of attorney executed in 1996, was not even admitted into evidence; nor did Jackie testify that she knew it existed.

Between May 15, 2000, and May 27, 2000, Jackie undertook the responsibility of caring for her father's medical needs. That, in and of itself, however, does not create a confidential relationship. This case is similar to *Sellers,* in that there was no evidence to allow the conclusion, without broad and unwarranted speculation, that a confidential relationship as to the

nature of Dana's bounty or its disposition existed.[4]  Because
Kurt failed to sustain his burden on this point, as Upman
requires, the case was properly dismissed.[5]

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-
GOMERY COUNTY AFFIRMED; COSTS TO BE PAID
BY APPELLANT.**

4.  This does not mean that Kurt has met his burden on the issue of
Dana's susceptibility to influence.  Essentially, Kurt asks us to presume
that, because his father was very ill, he was susceptible to influence.
That is a presumption we will not make.  *See, generally, Henkel v.
Alexander*, 198 Md. 311, 317–18, 83 A.2d 866 (1951) (noting that old
age alone is not sufficient to show undue influence).  In addition, the
evidence does not support the presumption because Kurt testified that
when he arrived at the hospital, Dana asked him what took him so long.
In addition, Kurt talked to his father on the day Kurt arrived in the
Washington area, and Dana told him to come by in the morning.  This
evidence hardly satisfies Kurt's burden of showing that Dana was not
aware of his surroundings.  The evidence is, at best, speculative, and
does not generate the inference that Kurt attempts to prove.  His
father's demeanor on the day of the signing is consistent with a person
suffering from a major illness, and not necessarily a person under the
influence of his daughter.

5.  Because we conclude that Kurt has failed to sustain his burden on his
claim of undue influence, we need not reach his evidentiary question.